M98VGIAS

```
 1    UNITED STATES DISTRICT COURT
      SOUTHERN DISTRICT OF NEW YORK
 2    ------------------------------x

 3    UNITED STATES OF AMERICA,

 4              v.                          20 Cr. 160 (MKV)

 5    LISA GIANNELLI,

 6                    Defendant.            Sentence

 7    ------------------------------x

 8                                          New York, N.Y.
                                            September 8, 2022
 9                                          11:05 a.m.

10

11    Before:

12                      HON. MARY KAY VYSKOCIL,

13                                          District Judge

14                             APPEARANCES

15

16    DAMIAN WILLIAMS,
           United States Attorney for the
17         Southern District of New York
      SARAH MORTAZAVI
18    BENJAMIN GIANFORTI
           Assistant United States Attorneys
19
      LOUIS V. FASULO
20    ALEX S. HUOT
           Attorneys for Defendant
21

22    Also Present:  Timothy Bergen, FBI
                      Sean McCabe
23

24

25
```

M98VGIAS

```
 1              (Case called)

 2              THE COURT:  Good morning, everyone.  Please be seated.

 3              THE DEPUTY CLERK:  Counsel, starting with the

 4    government, please state your name for the record.

 5              MS. MORTAZAVI:  Good morning, your Honor.

 6              Sarah Mortazavi and Benjamin Gianforti, for the

 7    government; and Special Agent Timothy Bergen from the FBI.

 8              THE COURT:  Good morning, counsel.

 9              And good morning, Special Agent Bergen.

10              MR. FASULO:  Good morning, your Honor.

11              Louis Fasulo, Fasulo, Braverman & DiMaggio, along with

12    Alex Huot and Sean McCabe, who's just going to get his

13    interview in October, so I guess he's still a paralegal, but he

14    has passed almost everything else.

15              THE COURT:  Congratulations.

16              All right.  Good morning to all of you.

17              And good morning, Ms. Voshell.

18              MR. FASULO:  And, of course, my client.

19              THE COURT:  Yes.  Good morning.

20              I have, up to this point, always called you

21    Ms. Giannelli, but I see who you are.

22              So good morning, everybody.  Thank you to all of you

23    for being here.  As I think you all know, I am Judge Vyskocil.

24    I have presided over this case from its filing through to

25    trial.
```

1          We're here today for the purpose of sentencing

2    Ms. Voshell.  Just to confirm, ma'am, do you speak and

3    understand English clearly and do not need an interpreter;

4    correct?

5          THE DEFENDANT:  Correct.

6          THE COURT:  So in November of 2020, a grand jury

7    returned a superseding indictment number S6 charging

8    Ms. Voshell in one count, Count Two of the S6 indictment, with

9    conspiracy to commit drug adulteration and misbranding, with

10    the intent to defraud or mislead, in violation of Title 18,

11    United States Code, Section 371; and Title 21, United States

12    Code, Section 331 and 333(a)(2).

13          On May 6th, after an eight-day jury trial, the jury

14    found Ms. Voshell guilty of the conspiracy charged in Count Two

15    of the S6 indictment.  The probation office has now completed

16    its investigation, and I have sentencing submissions from all

17    of the parties.

18          So for the record, the following is the record before

19    me in connection with today's sentencing:

20          I have the presentence report prepared by the

21    probation office filed on July 26, 2022.  That is at ECF number

22    896.  There were several revisions made by the probation office

23    to that report.  Those are outlined on page 46 of the

24    sentencing report.  Those revisions were largely to add

25    information about Ms. Giannelli -- I'm sorry, Ms. Voshell and

M98VGIAS

1    certain codefendants.  There are a number of objections to the

2    presentence report that are set forth on pages 39 through 45.

3          The government has not filed any objections to the

4    presentence report; is that correct?

5          MS. MORTAZAVI:  That's correct, your Honor.

6          THE COURT:  All right.

7          The defendant has filed the following objections,

8    which I will rule on once I get through laying forth for the

9    record what is before me in connection with sentencing.

10          So, Mr. Fasulo, I'm going to outline them, so make

11    sure you're paying attention so you can correct me if I miss

12    anything.  Okay?

13          MR. FASULO:  Yes, your Honor.

14          THE COURT:  All right.

15          Defendant objects to paragraph 7 regarding the

16    calculation of the forfeiture amount; paragraph 18, which

17    describes drugs possessed by other defendants in the background

18    section in the offenses charged in the indictment; paragraph

19    28, which describes -- I'm going to go back sometimes to using

20    "Giannelli," because that is what the PSR says, all right?

21          So paragraph 28, which describes Ms. Giannelli as

22    Fishman's principal sales representative; paragraph 30, which

23    mentions Dr. Fishman's overseas shipments; paragraph 31, which

24    stated that Ms. Giannelli primarily operated in New York, but

25    that was corrected to state that she primarily operated out of

M98VGIAS

her home in Delaware.

Defendant objects to paragraph 36, which states that Ms. Giannelli worked with Jordan Fishman and Rick Dane in furtherance of the conspiracy. There's an objection to paragraph 37, which previously stated or originally stated that Ms. Giannelli was a co-owner of Equestology, but that has been changed.

Defendant objects to paragraph 96 regarding the use of sophisticated means, and $13 million gain amount. Defendant also objected to paragraph 96 because it previously referred to her as a co-owner, but that has been corrected. And it previously stated that there were ten or more victims; but that also has been revised based on conversations with the parties and, I believe, indeed previous rulings by me.

There are also objections to paragraph 102, 106, and 109, but those have all now been revised to reflect that the government is not seeking restitution in this matter.

Paragraphs 110 and 111, whether the Court should impose an enhancement for obstruction based on Ms. Giannelli's — and this is a claim by the government — false testimony at trial that she believed there was a, quote, open prescription for every client in the Equestology database.

Defendant objects to paragraphs 112 and 113 with respect to whether Ms. Giannelli accepted responsibility; paragraph 116, again, involving the use of $13 million as the

M98VGIAS

1   gain amount, to add 20 points to the offense level calculation;

2   paragraph 117, adding a two-level enhancement for the use of

3   sophisticated means; paragraphs 132, 133, 139, 141, and 145,

4   all of which misstated some details about Ms. Voshell's

5   personal life.  And those, I believe, have all been revised to

6   reflect the objection.

7       There is an objection to paragraph 154 involving a

8   drug test.  And finally, there are objections to paragraphs

9   156, 160, 163, 165, and 167 regarding Ms. Voshell's work

10  history, income, and residences.  And those paragraphs have all

11  been revised as the Court understands it.

12      Have I listed all of the objections?

13      MR. FASULO:  Yes, your Honor.

14      You also listed the correct corrections that have

15  already been made on the presentence report.

16      THE COURT:  All right.  Thank you, Mr. Fasulo.

17      So also before the Court is the defendant's sentencing

18  submission which was filed on August 25.  That's filed at ECF

19  number 914.  And that submission includes Mr. Fasulo's

20  sentencing memorandum, a letter from Ms. Voshell, and 52

21  letters of support from family and friends.  Both the memo and

22  some of the letters of support have redacted personal

23  information, and that will be maintained under seal.

24      And finally, the Court has the government's sentencing

25  submission filed on September 1 of this year; that's filed at

M98VGIAS

1    ECF 919.  That submission attaches 129 pages of exhibits, all

2    of which were familiar to the Court from the trial.

3            Have I correctly recited what is before the Court in

4    connection with today's sentencing?  Counsel?

5            MS. MORTAZAVI:  Yes, your Honor.

6            MR. FASULO:  Yes, your Honor.

7            THE COURT:  All right.  Thank you.

8            So let me first ask Mr. Fasulo, have you had a chance

9    to review the presentence report and to lodge any objections

10   after discussing it with your client?

11           MR. FASULO:  Judge, we had the opportunity to review

12   these reports ourselves; we had the opportunity to review them

13   with Ms. Voshell, Ms. Giannelli; and we have no further

14   objections at this time.

15           THE COURT:  All right.  Thank you.

16           Ms. Voshell, have you had the opportunity to read and

17   review the presentence report, to talk about it with your

18   counsel, and to ask them to make any -- that's okay.  That's

19   all right.  To make any objections that you wish for them to

20   make?

21           THE DEFENDANT:  Yes, your Honor.

22           THE COURT:  All right.

23           The one thing I would ask is could somebody put a

24   microphone in front of Ms. Voshell?  Isn't there another

25   microphone?  Yes.  Perfect.  Thank you.

M98VGIAS

1                All right.  Yes, you have?

2                THE DEFENDANT:  Yes, your Honor.

3                THE COURT:  All right.  Thank you.

4                All right.  Has the government had an opportunity to

5       read the report and to tender any objections?

6                MS. MORTAZAVI:  Yes, your Honor.

7                And our only notation is that, as the PSR reflects,

8       the government would ask that the Court apply the two-point

9       enhancement for obstruction of justice.  It could be, based on

10      the Court's rulings, that it is immaterial and so it does not

11      need to be ruled upon, but I wanted to make that notation.

12               THE COURT:  All right.  I understand.

13               And is it correct there are no additional late

14      objections for good cause, Mr. Fasulo?

15               MR. FASULO:  None from the defense, Judge.

16               MS. MORTAZAVI:  None from the government.

17               THE COURT:  All right.

18               There is nothing that the Court will be excluding from

19      the report in this case.

20               I do have a couple of questions that I want to ask the

21      parties before we turn to the objections.

22               First, Mr. Fasulo, can you confirm for me that you

23      have reviewed the proposed mandatory, standard, and special

24      conditions of release, in the event there is a term of

25      supervised release with Ms. Voshell, and that I can refer to

M98VGIAS

1   them generically as "conditions"?

2           MR. FASULO:  Judge, I reviewed them with

3   Ms. Voshell/Ms. Giannelli.  And you may refer to them

4   generically.  However, I will also, after you refer to them

5   generically, specifically go over them with Ms. Voshell based

6   on what your sentencing is here so that we are clear and she is

7   clear of those again.

8           THE COURT:  All right.

9           Ms. Voshell, is that correct?  You have reviewed with

10  counsel the proposed conditions of supervised release?

11          THE DEFENDANT:  Yes, your Honor.

12          THE COURT:  All right.

13          And you've had ample opportunity to confer about them;

14  you understand them?

15          THE DEFENDANT:  Yes, your Honor.

16          THE COURT:  All right.

17          Are there any objections to the proposed special

18  conditions, Mr. Fasulo?

19          MR. FASULO:  None from the defense, Judge.

20          THE COURT:  All right.

21          I should add that I would intend to add to what is

22  proposed in the PSR as a special condition a condition that I

23  imposed at the start of this case, that any rules or

24  regulations of the licensing authorities, if there are any

25  applicable to Ms. Voshell, be complied with.

M98VGIAS

1          Any objection to that?

2          MR. FASULO:  Judge, we have no objection to that as

3    well.

4          THE COURT:  All right.  Thank you.

5          All right.  Finally, I am inclined to suspend the

6    mandatory drug testing condition that is contained in the

7    standard form of judgment.  And that, in my view, is

8    notwithstanding the fact that there was a positive test for

9    Codeine.

10          I did follow up with the probation office.  At your

11    request, Mr. Fasulo, I believe, a second test was done.  The

12    PSR reflects that the results were not yet back.  I followed up

13    with probation; those results came back negative.  I do not

14    believe there is an issue here with respect to drug use, so it

15    would be my intent to suspend that mandatory drug testing.

16          Anything for the record?

17          MS. MORTAZAVI:  No objection from the government.

18          MR. FASULO:  Thank you, your Honor.  Nothing.

19          THE COURT:  All right.

20          So first, I accept any undisputed portion of the PSR

21    as a finding of fact at this time.

22          I will turn now to the numerous objections to the PSR

23    that have been raised by the defense and we'll work through

24    them one by one, all right?

25          So first, the defense, as I noted, objects to

1    paragraph 7 regarding the calculation of the forfeiture amount.

2    The government is seeking forfeiture in the amount of

3    $13,438,314.20, pursuant to 21 U.S.C., Section 334, and 28

4    U.S.C., 2461.  And that statute authorizes the forfeiture of

5    money representing drugs subject to seizure under the FDCA.

6            Is that correct?

7            MS. MORTAZAVI:  That's correct, your Honor.

8            THE COURT:  All right.

9            And according to the PSR, the defense objects that the

10   government hasn't proven that the drugs that Ms. Giannelli

11   personally held for sale at her property amounted to that 13.4,

12   I'm going to call it, million dollars.  So the PSR makes very

13   clear that the $13 million number is based on Equestology's

14   total sales of the total conspiracy based on records from the

15   bank accounts.  Is that accurate?

16           MS. MORTAZAVI:  That's correct, your Honor.

17           THE COURT:  There are a couple of questions.

18           First is whether the statute authorizes joint and

19   several liability for the proceeds of the conspiracy.  As you

20   know, I previously ordered forfeiture against Dr. Fishman.  So

21   neither side has provided the Court with any authority or any

22   argument, frankly, on this point beyond probation's recitation

23   in the PSR of each side's position.

24           So I have done some research, and it is the Court's

25   view that joint and several liability is not appropriate.  The

M98VGIAS

1    Court does not believe that Ms. Voshell can be required to

2    forfeit money representing drugs that she never touched or

3    proceeds that she never directly or indirectly obtained,

4    notwithstanding her role as a co-conspirator of Equestology.

5    So I'm relying on the reasoning in a case called *Honeycutt v.*

6    *United States*, 137 Supreme Court 1626.

7              Hold on.  Let me finish.

8              It's a 2017 case.

9              In that case, the Supreme Court rejected the

10   government's request for joint and several liability in a

11   forfeiture judgment for someone convicted of a drug conspiracy.

12   I appreciate that the court in that case was interpreting a

13   different statute:  the forfeiture statute at 21 U.S.C.,

14   Section 853.  It has different operative language.

15             But I think the reasoning of that case applies here.

16   Forfeiture generally applies to tainted assets, property that a

17   defendant used in or acquired because of the crime.  And that's

18   a quote from *Honeycutt* at page 1631.

19             If Ms. Giannelli were to be held responsible for

20   13-plus million dollars in forfeiture, some of that judgment

21   would have to be paid from untainted assets, meaning money that

22   she neither directly nor indirectly obtained as a result of her

23   crimes.

24             Now, I appreciate that the government calculation is

25   based on money that flowed through the Equestology bank

M98VGIAS

1    accounts, and Ms. Giannelli did jointly control as a cosigner

2    and a regular accesser of those accounts.

3        I am prepared to hear argument from the government

4    that Ms. Giannelli indirectly used or obtained all of the

5    assets of Equestology or that the applicable forfeiture

6    statutes are more expansive than the statute that was at issue

7    in *Honeycutt*.  But at this stage, without any briefing on this

8    point, I am inclined to sustain the defense objection, but to

9    order a much lower forfeiture amount.

10       I am troubled by the fact that I am being put in the

11   position of dealing with this issue today.  I went back and

12   studied this forfeiture issue very, very carefully.  And the

13   statute makes it clear that, first of all, the forfeiture issue

14   is supposed to be dealt with before sentencing.  It also says

15   that if forfeiture is contested — and the government was on

16   notice that forfeiture is contested here — the Court must

17   determine the amount of money that the defendant will be

18   ordered.  And if forfeiture is contested on either parties'

19   request, I would conduct a hearing after the verdict.

20       There's been no request from either side for me to

21   conduct a hearing on forfeiture.  And neither side, as I say,

22   has really briefed this issue for me with any legal authority.

23   I received at 7 o'clock last night a proposed preliminary order

24   of -- I don't even know if it was labeled "preliminary," a

25   proposed order of forfeiture.

M98VGIAS

1          I'm prepared to do the following:

2          Based on the record that was before me in connection

3   with this trial, Ms. Voshell has conceded that based on her tax

4   returns and other records in evidence, she earned $150,000 for

5   six years, from 2014 through 2019.  That totals $900,000.  I'm

6   prepared to order forfeiture in that amount.  I recognize the

7   conspiracy ran for three times that time period, but there's no

8   evidence in the record and no briefing and nothing on which I

9   can base a forfeiture amount to triple that to 2.7 million.

10  And in my view, that's a failure on the government's part here.

11         So let me -- I'll hear from each of you.

12         MR. FASULO:  Judge, just so we're clear, both counsels

13  have spoken about this today.  We had received this last night.

14  And not in defense of the process, and I understand it's a

15  complicated process, we were waiting for the prosecution -- we

16  understand, first of all, that in the *Fishman* case, there is

17  still a question as to the amount of forfeiture that the Court

18  is going to order.  I understand that's still under briefing

19  and the Court has not come up with a firm number at this time.

20  I could be incorrect, but that was my understanding.

21         THE COURT:  That's sort of news to me.

22         I guess the order I entered might be called a

23  preliminary order of forfeiture, but --

24         MR. FASULO:  I thought there were still briefings on

25  that issue.  Maybe I'm incorrect on that, but that's my

M98VGIAS

1    understanding.

2            In any event, the point being that we were waiting for

3    the government to come up with a number as to Ms. Giannelli,

4    I'm sorry.  And once that number was given to us, then we can

5    make a decision whether or not we need a hearing on that or not

6    a hearing.

7            THE COURT:  Didn't you have it in the PSR?

8            MR. FASULO:  Well, the first PSR said none -- we had

9    it in the PSR, you're correct.  That's correct.  I'm sorry.

10           THE COURT:  And you've had that for a while.

11           MR. FASULO:  Yes, we did have the number in the PSR.

12           THE COURT:  So I don't know why neither side asked me

13   for a hearing on this issue.

14           MR. FASULO:  Can I talk to you for a second?

15           THE COURT:  Sure.  I mean, if the parties can work

16   this issue out.

17           (Counsel conferred)

18           MS. MORTAZAVI:  So, your Honor, to address this

19   forfeiture issue and maybe further explicate why this was not

20   briefed in advance of sentencing or why no hearing was

21   requested, my understanding was that there is no factual

22   dispute; and so no factual record needed to be developed

23   through a hearing.

24           I think the parties, just looking at the record,

25   arrive at different conclusions.  And the government's

M98VGIAS

1    conclusion and position was that because, as the Court noted,

2    the defendant had constructive control of the Equestology

3    account where the funds flowed.  The government is well aware

4    of *Honeycutt* and believed that under *Honeycutt*, she could be

5    said to have come into possession of the funds.  She was able

6    to pay herself out of that account, she was a cosigner of that

7    account, she opened that account; she stands on the same

8    footing as Seth Fishman.

9              THE COURT:  I don't think that's correct.

10             Dr. Fishman was the owner of Equestology.  She was

11    not.  Yes, she was -- I'm sorry to call you "she."  Ms. Voshell

12    was an authorized user of those bank accounts, but nothing

13    suggested that she had the right to take all of the money that

14    passed through that account.  I saw no evidence of that at the

15    trial.

16             MS. MORTAZAVI:  I recite that to explain the

17    government's position and why we reached the conclusion that,

18    under our reading of the law, we believe that she could be

19    found to have constructive possession of all the funds that

20    flowed through the account, which is why this matter was not

21    teed up in the way that it is now being discussed among the

22    parties.

23             Our proposal, after having discussed with Mr. Fasulo,

24    is that today this Court enter a forfeiture amount of $900,000,

25    which is supported in the PSR.  I think it's still consistent

M98VGIAS

1    with the government's view, and Mr. Fasulo does not intend to

2    contest that given what the Court has said to you.  And as was

3    the case with Seth Fishman, where I believe there was some

4    discussion of 32.2 and the government's ability to apply to the

5    Court for revision of the forfeiture order, if needed, the

6    government would ask simply again that the Court enter an order

7    for $900,000 worth of forfeiture.  And the government will

8    contemplate whether it will seek further briefing and further

9    revision of that forfeiture amount.

10            MR. FASULO:  Judge, that's what we agreed to.  That's

11    our understanding.  And just one moment to explain it.

12            THE COURT:  Yes, you should talk to your client.

13            (Counsel conferred with defendant)

14            MR. FASULO:  Judge, I had the opportunity to speak

15    with my client.  And we consent and agree with the proposal as

16    presented to the Court just now.

17            THE COURT:  Thank you, Mr. Fasulo.

18            I received last night the proposed forfeiture order,

19    so I would ask the government to please submit a revised form

20    of order.

21            As you know, I'm obligated to announce the forfeiture

22    amount as part of the sentencing and to include it in the

23    judgment.  It had been my intent to enter an order of $900,000.

24    So that is what I'm going to do.  Now, it's on consent by the

25    parties, and the government has whatever rights it has to seek

1    amendment if you choose to do that.

2           I'm reminded, Mr. Fasulo, on your point about Dr.

3    Fishman, that apparently that's what his counsel said it wanted

4    to do.  But, to my knowledge, there's been no further briefing

5    on the issue.  But that's really not relevant for what we're

6    here for today.

7           All right.  So that resolves the objection to

8    paragraph 7.

9           Next, the defense objects to paragraph 18.  In that

10   paragraph, the probation office laid out the various schemes

11   charged in the indictment.  They summarize the entire

12   indictment against all defendants, not just Ms. Giannelli.  And

13   paragraph 18 mentions several drugs, including SGF-1000 and

14   something known as red acid that were possessed by defendants

15   other than Ms. Giannelli.  I agree that Ms. Giannelli had

16   nothing to do with those two substances.  But probation has

17   added a note, footnote 8, confirming that those drugs are not

18   relevant to Ms. Giannelli's offense conduct.

19          Based on that revision, Mr. Fasulo, is the objection

20   withdrawn?

21          MR. FASULO:  It is withdrawn, Judge.

22          THE COURT:  Okay.  All right.

23          The defense next objects to paragraph 28, which

24   describes Ms. Giannelli as Dr. Fishman's principal sales

25   representative.  The defense argues that Ms. Giannelli was one

M98VGIAS

1    of three office members.  She did not have sole responsibility

2    for sale.

3            The parties' positions, by the way, are summarized to

4    me in the probation report.  So counsel can feel free to

5    correct or supplement what's summarized in the report if

6    probation has misstated either side's positions, all right?

7            The defense apparently similarly argues — it does — in

8    its sentencing memorandum that Ms. Giannelli's role at

9    Equestology was similar to that of Courtney Adams, an office

10   manager who testified at the trial.

11           The Court does not agree with the defense on this

12   point.  The objection is overruled.

13           First, the PSR does not say that Ms. Giannelli had

14   sole responsibility for sales; it accurately states that she

15   was the principal sales representative for Equestology.  This

16   characterization was put to the jury.  The jury convicted

17   Ms. Giannelli.  The government's opening statement said the

18   following:  The defendant was Equestology's main salesperson.

19           Now, I associate that an opening statement is not

20   evidence, but that was the government's theory of its case.

21   The government did also introduce at trial and now attaches to

22   its sentencing memorandum significant evidence confirming that

23   Ms. Giannelli was the principal salesperson, including a list

24   of Equestology products that Ms. Giannelli put together; that's

25   GX-711.  A long list of clients that Ms. Giannelli would cold

M98VGIAS

1    call to try to sell those products; that's Government Exhibit

2    707.  Communications in which Ms. Giannelli gave instructions

3    to Dr. Fishman, to Ms. Adams, and to the later office manager,

4    Mary Fox, about how to boost and execute sales; that's

5    Government Exhibit 309.  Also, Government Exhibit 319-U and

6    311.  So that objection is overruled.

7            Anything further on that from either side?

8            MR. FASULO:  No, Judge.  We rely on the trial

9    transcripts and our objection.

10           THE COURT:  All right.

11           Paragraph 30, which mentions Dr. Fishman's overseas

12   shipments, the defense argues that Ms. Giannelli was not

13   involved in Dr. Fishman's overseas business.

14           Anything further from either side on this before I

15   rule?

16           MS. MORTAZAVI:  Only to emphasize, your Honor, that

17   the focus on trial and what was presented as evidence at trial

18   really misapprehends the purpose of the PSR, which is to

19   provide the Court with a global view of the conduct of others,

20   including the conspiracy itself.

21           And I would just further reiterate that based on her

22   conversations with Seth Fishman, her knowledge, actual

23   knowledge, that he was traveling abroad when he was traveling

24   abroad, we believe that that international sales arm of the

25   business was foreseeable to her.

M98VGIAS

1         MR. FASULO:  Judge, we had the opportunity to go over

2    terabytes of material in this case.  There's no indication in

3    any of the materials or any of the recordings or any of the

4    text messages that Ms. Giannelli's involved in any

5    international sales.

6         It is true that she recognized that Dr. Fishman went

7    overseas.  But as a professional in his field, he had the right

8    to continue many businesses in which the Court is very well

9    aware of, his involvement both in production and in compounding

10   and other businesses that Ms. Giannelli had nothing to do with.

11   So the mere fact of her knowledge that he's overseas does not

12   put her in a position to be responsible for any of the

13   businesses that happened overseas, and it did not come up in

14   any of the sales reports from her, none of the text messages,

15   nothing that was introduced in this Court, nor anything that I

16   was able to review in the mounds and hours and hours and hours

17   of review of the materials in this case.

18        THE COURT:  All right.

19        Mr. Fasulo, your objection is overruled though.  All

20   of what you said is true and correct, but the purpose of the

21   PSR is simply to -- this portion of the PSR is to summarize the

22   allegations and the evidence and the background facts.  That

23   paragraph talks about Dr. Fishman's overseas activities.

24        As you know, I paid very careful attention during

25   trial.  I am aware that there is no evidence that Ms. Giannelli

M98VGIAS

1    personally was involved in the overseas business of

2    Equestology.  But the reality is that she was convicted of a

3    conspiracy.  And even if she didn't personally participate or

4    know about those specific acts, under *Pinkerton*, she is liable

5    for the conspiracy, which includes that conduct by Dr. Fishman.

6         I will say that I don't read the PSR as implying — let

7    alone saying outright — that Ms. Giannelli participated in any

8    overseas activity.  It accurately describes activities of her

9    co-conspirator, Dr. Fishman, during the course of the

10   conspiracy.

11        So the objection is overruled.

12        I will say, I don't find this fact particularly

13   material in any respect to sentencing.  And I will note that

14   for the record as well.

15        All right.  Paragraph 31 previously or originally

16   stated that Ms. Giannelli primarily operated in New York.  I'm

17   assuming this objection is withdrawn, since the PSR has been

18   revised to now reflect that Ms. Giannelli primarily operated

19   out of her own home in Delaware.

20        MR. FASULO:  Yes, Judge.  And as I said, we accept all

21   the changes that the PSR has made, so we withdraw any objection

22   here.  I guess we accept the changes is a better way to say it.

23        THE COURT:  All right.

24        But the final PSR, you're not objecting to that

25   paragraph.

M98VGIAS

1          MR. FASULO:  That is correct, your Honor.

2          THE COURT:  All right.

3          Because what I'm going to do at the end of all of

4   this, as you know, is accept the PSR as modified, if I do so,

5   with the objections having been overruled.  So it's the final

6   PSR we're talking about.  So I do need a record that you're

7   withdrawing the objection to paragraph 31.

8          MR. FASULO:  That is correct.

9          THE COURT:  All right.

10          Paragraph 36 states that Ms. Giannelli worked with

11   Jordan Fishman and Rick Dane in furtherance of the conspiracy.

12   Is that objection being pressed, Mr. Fasulo?

13          MR. FASULO:  If I may have a moment again, Judge.

14          THE COURT:  Sure.

15          (Counsel conferred with defendant)

16          MR. FASULO:  Judge, we're going to modify that

17   objection in the sense that we are keeping the objection as to

18   Jordan Fishman.  She had never met or talked to Jordan Fishman

19   or knew Jordan Fishman.  But as to Rick Dane, we are going to

20   withdraw the objection.

21          I'm sorry, Judge, if I may.  It's not only that I'm

22   making that representation, also in my review of the documents

23   in this case I did not see documents to corroborate that

24   relationship between Ms. Giannelli and Jordan Fishman.

25          THE COURT:  All right.

M98VGIAS

1          Ms. Mortazavi, I will say that while I did not go back

2    and look at every single trial exhibit, you state that there

3    are communications between Ms. Giannelli and Jordan Fishman's

4    lab.  You didn't attach those communications to your sentencing

5    submission, and I didn't easily pull anything from the trial

6    exhibits.  Are you able to amplify?

7          MS. MORTAZAVI:  Those communications exist.  It's true

8    we didn't attach it to our submission, for which I apologize.

9    There are communications with, again, individuals at 21st

10   Century regarding the coordination of shipments, including

11   shipments of pallets of drugs that were being sent from 21st

12   Century, however.

13          THE COURT:  To Ms. Giannelli or to Equestology?

14          MS. MORTAZAVI:  To Ms. Giannelli's residence.  There

15   is one communication in particular, and the date escapes me,

16   where she responds to the fact that she's received a pallet of

17   drugs and will need a forklift to get them in.  I think she

18   meant that in jest, but she was referring to the volume of

19   drugs she just received.

20          However, I believe that this paragraph can be modified

21   to reflect that they worked -- or they were -- form part of the

22   same conspiracy.  I don't think it's particularly material that

23   she had direct contact with Jordan Fishman.  I think it's

24   undisputed that they were part of the same conspiracy.

25          MR. FASULO:  Judge, I'm also familiar with what the --

M98VGIAS

1    the reference that counsel has made to a prior -- I think it

2    was an email.  But that email was an internal person at

3    Equestology, not to somebody outside of Equestology.

4           THE COURT:  No, but it does reflect that she did

5    business with Jordan Fishman or at least his lab.

6           MR. FASULO:  And other labs, that is true.

7           And as the government put in their evidence, there

8    were a number of labs and a number of places where items were

9    ordered from, and none of those people are co-conspirators in

10   this case.  I think it's a reach in this case.  I don't know

11   how relevant it is.

12          The Court has already had the opportunity to sentence

13   Jordan Fishman, so -- and they're familiar with that case.  So

14   I'm not really sure how relevant it is to the Court's reasoning

15   here, but I think it was important to point out in our

16   objection.  As I said, we do withdraw it as to Rick Dane.  And

17   we do accept that there was this one email about a delivery

18   that came to her place that needed almost a forklift because it

19   was a big delivery, and it came from Mary Fox at Equestology in

20   Florida.  So we do admit to that.

21          THE COURT:  All right.  So I will say for the record

22   that this particular factual recitation is not particularly

23   relevant or meaningful in terms of my sentencing determination

24   and reasoning.  The paragraph should be modified to reflect

25   Ms. Mortazavi's proposal that Jordan Fishman is charged in the

M98VGIAS

1    same -- and has pled guilty to the same conspiracy.  So they

2    were part of the same conspiracy and --

3         MR. FASULO:  We have no objection to that change,

4    Judge.

5         THE COURT:  -- and Ms. Giannelli and Equestology did

6    business with Jordan Fishman.  The communications part can go.

7         MS. MORTAZAVI:  And that's acceptable --

8         MR. FASULO:  With 21st Century, which was Jordan

9    Fishman's company.

10        THE COURT:  Yes, I'm sorry.  If I misspoke, I meant

11   21st Century.

12        MR. FASULO:  Yes.  No objection to that change, Judge.

13   And we withdraw our previous objection.

14        MS. MORTAZAVI:  And no objection from the government.

15        THE COURT:  All right.

16        And you've withdrawn any objection about Rick Dane.

17        Next, paragraph 37, among other paragraphs, previously

18   stated that Ms. Giannelli was a co-owner of Equestology.  I

19   believe that that has all been revised.

20        MR. FASULO:  We withdraw our objection to that based

21   on the revisions.

22        THE COURT:  All right.

23        Paragraph 96 regarding the use of sophisticated means

24   and the $13 million gain amount, there was previously also an

25   objection.  I guess the original version of the PSR, as I said

M98VGIAS

1    before, referred to Ms. Giannelli as a co-owner of Equestology.

2    The Court is fully aware she was not a co-owner, and I believe

3    that has all been revised.

4         MS. MORTAZAVI:  To the government's knowledge, yes.

5         THE COURT:  Mr. Fasulo?

6         MR. FASULO:  They have a note here, Judge, that it

7    has, so I will rely on my note-taking.

8         THE COURT:  All right.  And I'll note for the record

9    that in the Court's reasoning, I am not considering her a

10   co-owner of Equestology and I'm well aware of what her

11   involvement was.

12        There was also an objection because I guess the

13   original version stated that there were ten or more victims,

14   but that has been revised and eliminated.

15        MR. FASULO:  We withdraw our objection on that, Judge,

16   based on the revision.

17        THE COURT:  Okay.  So now, the two remaining matters,

18   the sophisticated means and the gain amount, these are really

19   objections to the calculation of the offense level.  But you've

20   raised them in the context of the factual recitation at

21   paragraph 96, so I will deal with them now.

22        So with regard to sophisticated means, the guidelines

23   instruct me to apply a two-level enhancement for sophisticated

24   means if, quote, the defendant relocated or participated in

25   relocating a fraudulent scheme to another jurisdiction to evade

1    law enforcement or regulatory officials; B, a substantial part

2    of the fraudulent scheme was committed from outside the United

3    States; or C, the offense otherwise involved sophisticated

4    means, and the defendant intentionally engaged in or caused the

5    conduct constituting sophisticated means.

6          The guidelines go on to explain that sophisticated

7    means encompasses "complex" or, quote, intricate offense

8    conduct pertaining to the execution or concealment of an

9    offense.  For example -- and this is all a quote from the

10   guidelines and the policy statements and explanatory notes.

11         "For example, in a telemarketing scheme, locating the

12   main office of the scheme in one jurisdiction, but locating

13   soliciting operations in another jurisdiction ordinarily

14   indicates sophisticated means.  Conduct such as hiding assets

15   or transactions or both through the use of fictitious entities,

16   corporate shells or offshore financial accounts also ordinarily

17   indicate sophisticated means."

18         A jury found that Ms. Giannelli knowingly participated

19   in the conspiracy to make and to sell highly sophisticated,

20   custom, untestable performance-enhancing drugs.  The Court's

21   finding is that that offense conduct clearly involved

22   sophisticated means.

23         While it is true, as the defense argues, that

24   Ms. Giannelli did not personally design or compound the

25   adulterated or misbranded drugs sold by Equestology or, they

M98VGIAS

claim, make defective labels for those drugs, she did engage
intentionally in Equestology's sophisticated enterprise, and
she worked with and collaborated with Dr. Fishman to conceal
the sale of those drugs.

So I can go on.

Mr. Fasulo, you argued at trial that Ms. Giannelli was
brought on to help organize the business. She created systems
and databases to keep track of the products and clients; she
created the list of products that featured prominently at her
trial Government Exhibit 711. That exhibit touted the drugs'
performance-enhancing effects, their scientific formula and,
most importantly, the untestability of those drugs.

Ms. Giannelli repeatedly prompted Dr. Fishman to help
her describe these sophisticated products in terms that would
be understandable to laymen. And I point specifically to
Government Exhibit 319-G, or in, quote, horsemen's terms.
That's Government Exhibit 319-U.

Ms. Giannelli advised her clients which drugs to use
and how to avoid tests on those drugs. And that's trial
transcript 189, lines 7 to 25; and Government Exhibit 320-FI.

She also took steps to make sure that the products
remained undetectable by keeping them out of the hands of
racing authorities, including investigating whether clients
were trustworthy, deciding where products could be delivered
without being detected. Government Exhibit 1915 and 320-FA.

M98VGIAS

1          The Court does find the defendant used sophisticated

2     means in connection with the offense, and the objection is

3     overruled.

4          All right.  I turn next to the calculation of gain.

5          Mr. Fasulo, I want to find out from you whether the

6     recitation on page 42 at the PSR of your position is accurate.

7     It says that you concede that there was actual loss, but that

8     the amount of the loss cannot be calculated.  Is that a correct

9     statement of your position?

10         MR. FASULO:  I'm sorry, Judge.  Give me one moment.

11         THE COURT:  Sure.

12         Talking about the fifth paragraph in particular.

13         MR. FASULO:  Our position is that since the government

14    can't articulate the real loss here, that they can use gains.

15         THE COURT:  That's what I'm asking.

16         That is your position.

17         MR. FASULO:  And based on what the Court has already

18    ruled in terms of the reasoning that the Court used for the

19    forfeiture order, we understand the gain issue in those terms,

20    but we still object to the $13 million gain.

21         THE COURT:  You object to the number, but not to the

22    logic.  In other words, you concede there was an actual loss,

23    the loss cannot be quantified; therefore, the Court should look

24    to gain.

25         MR. FASULO:  Correct, your Honor.

M98VGIAS

1          THE COURT:  Okay.

2          All right.  So the guidelines define actual loss to

3    include any reasonably foreseeable pecuniary harm resulting

4    from the offense.  Under the guidelines, as Mr. Fasulo has just

5    conceded, gain may be used as an alternative measure to

6    calculate the Section 2B1.1(b)(1) loss enhancement "only if

7    there is a loss, but it reasonably cannot be determined."  And

8    that's in the application note 3B.  And I would also refer to

9    *United States v. Romano*, 794 F.3d 317, 338 (2d Cir. 2015).

10          I have no trouble finding — and Mr. Fasulo has

11    actually agreed — that there was an actual loss as a result of

12    the conspiracy charged in Count Two of the indictment of which

13    Ms. Giannelli was convicted.  Customers could gain an unfair

14    advantage over their competitors to win purse money from horse

15    races, and there is ample evidence of that.  I'm not going to

16    belabor this point, so that because Mr. Fasulo has conceded

17    that there was a loss.  I do also find, as he has conceded,

18    that the loss amount cannot reasonably be calculated in this

19    case and it is, therefore, appropriate to resort to gain to

20    calculate the enhancement.

21          Gain is not the same as forfeiture or restitution.

22    Gain, as used here, is the gain from the offense.  The Court's

23    ruling is that Equestology's gain here can be calculated from

24    its bank records and is the appropriate measure of gain.  So

25    for this purpose, the 13.4 rounded number is an appropriate

M98VGIAS

1   measure of gain and the objection is overruled.

2           MR. FASULO:  Just for the record, Judge, our objection

3   is narrowly formulated here as to the actual number that the

4   Court is using as the loss.

5           THE COURT:  Do you want to articulate your position,

6   what it should be?

7           MR. FASULO:  As the Court said -- well, I think that

8   it's very hard to determine what the actual gain was.  And, in

9   fact, there was a gain of -- if you look at just the bank

10  records, there was a number of products that are generic

11  products that are not medical in any nature that are included

12  in that calculation of 13 million.  There were vitamins that

13  can be bought anywhere that Ms. Giannelli was involved in

14  distributing and that were part of those numbers.  So, in fact,

15  we would object to that number.  And I can't get a clear number

16  because the records don't indicate that to me.

17          THE COURT:  All right.

18          So as noted, the objection is overruled.

19          Next, defendant objects to paragraph 102, 106, and

20  109.  Those all dealt with restitution and that has been

21  revised.  So I assume that is all withdrawn or mooted.

22          MR. FASULO:  Mooted -- withdrawn and mooted.

23          THE COURT:  All right.

24          Paragraphs 110 and 111 are the next issue.

25          Now, here, the government -- the PSR and the probation

M98VGIAS

1    office did not add, in doing their calculation, a two-level

2    enhancement for obstruction of justice.  The government has not

3    objected to the PSR; although you take the position that the

4    Court should impose an enhancement for obstruction based on

5    Ms. Giannelli's what you call false testimony at trial.

6              Correct?

7              MS. MORTAZAVI:  Correct, your Honor.

8              THE COURT:  All right.

9              And you base that on the government's view that

10   Ms. Giannelli's testimony that there was an open prescription

11   for every client in the Equestology database was false

12   testimony.  This isn't really an objection to the PSR because,

13   as I say, that's not a factual statement in the PSR to which an

14   objection can be made.

15             In any event, paragraph 110, it simply states what

16   your belief is, that there should be an enhancement.  Paragraph

17   111 goes on to state probation defers to the Court.  And the

18   calculation in the PSR does not include an enhancement.

19             I'll go through my own calculations in a moment when

20   we get to that portion of today's proceedings.  But I will tell

21   you now, I am not applying an enhancement for obstruction of

22   justice.  You insist that Ms. Giannelli lied when she testified

23   she didn't know which products required prescriptions, and that

24   she believed Dr. Fishman had an open prescription for his

25   clients.  Ms. Giannelli's position is she testified honestly.

M98VGIAS

1          I take seriously a defendant's right to go to trial

2    and to defend herself.  And I am not prepared to apply an

3    enhancement based on her testimony in her own defense.

4          The consequence of her going to trial and giving

5    testimony which you say was false very well may be the outcome

6    that we had here.  The jury rejected Ms. Giannelli's testimony;

7    and they found her guilty of the offense.  So I am not going to

8    add an enhancement based on the contention that she has lied

9    and that constitutes obstruction.

10          I will note for the record though, by the way, that

11    neither this issue about the two-point enhancement, nor the

12    issue about sophisticated means, which is also two points in

13    the calculation, affects the outcome in any way about the

14    guidelines calculation because, either way, if I were to add

15    the additional two points, that would get us up to a base

16    offense level of 28.  If I were to use what's in the PSR but

17    take away the sophisticated means enhancement, I think that

18    gets us down to 24, I believe.  But, in any event, the

19    guidelines calculation range would be above the statutory

20    maximum under any of these various scenarios.

21          So you have my ruling on the merits that I don't

22    believe an obstruction enhancement is warranted or appropriate

23    here.  But I do note for the record that it does not affect the

24    guidelines calculation in any event, and neither does the

25    sophisticated means enhancement.

M98VGIAS

1          MR. FASULO:  I think what the Court meant is it

2    doesn't affect the mandatory sentencing, which is below the

3    guideline numbers.  Because the guideline numbers are above.

4          THE COURT:  Correct.

5          MR. FASULO:  It does affect the guidelines --

6          THE COURT:  No, but the guidelines calculation -- the

7    guidelines range becomes the statutory maximum.

8          MR. FASULO:  Correct, Judge.

9          THE COURT:  So the calculation would be above that; in

10   all cases it gets reduced to the statutory maximum.

11         MR. FASULO:  That's how I understood it, but I heard

12   it a little differently.  Thank you, Judge.

13         THE COURT:  All right.

14         Next, the defendant objects to paragraphs 112 and 113,

15   which deal with the issue of whether Ms. Giannelli deserves

16   credit for acceptance of responsibility.

17         Paragraph 112 reflects Ms. Giannelli's contention that

18   she didn't want to break the law and that she merely failed to

19   educate herself about Dr. Fishman's misconduct.  Paragraph 113

20   states that based on probation's investigation, Ms. Giannelli

21   clearly has not demonstrated acceptance of responsibility.  And

22   the guidelines calculation in the PSR does not give her credit

23   for acceptance of responsibility.

24         The defense objects, saying that Ms. Giannelli has

25   accepted responsibility because she stated -- and actually, I

1    think this is not her statement; as I recall it, I think it's

2    in her husband's letter, but I could be wrong about that.

3    After hearing all of the facts, I knew there was no other

4    option for the jury but to find me guilty.  And that is

5    repeated again in the PSR at page 43.

6         The government maintains that Ms. Giannelli does not

7    deserve credit for acceptance of responsibility.  The PSR

8    simply defers on page 44 to the Court on this issue.

9         I am not giving credit in my guidelines calculation

10   for clearly demonstrating an acceptance of responsibility.

11   Saying that after hearing the evidence at trial, there was no

12   other option for the jury but to convict is not acceptance of

13   responsibility.

14        In Ms. Giannelli's interview with probation and in the

15   sentencing submission, including her own letter to the Court

16   and, frankly, her husband's letter and many of the letters,

17   they go on to maintain that Ms. Giannelli didn't know, she

18   didn't believe that she was doing anything wrong during the

19   decades-long conspiracy of which she was convicted.  She

20   maintains that she's guilty only of wanting to believe

21   everything was aboveboard.  That's in the defense memo at page

22   6.  She does say, I see now that what my employer had me do was

23   illegal.  That's in the defense memo at page 6.

24        Ms. Giannelli made this argument at trial, as was her

25   right.  And the jury rejected it.  The jury found beyond a

1    reasonable doubt that Ms. Giannelli knowingly participated in a

2    criminal conspiracy to adulterate and misbrand drugs with an

3    intent to defraud or mislead.

4        I recall that at the outset of the trial, Mr. Fasulo,

5    you wrote on that smart board or the Elmo, I don't know which

6    it was, the word "intent." You told the jury that that's what

7    the case was about. And the jury found that Ms. Giannelli had

8    the intent to defraud or mislead. I'm not going to go through

9    all the evidence of that.

10       But I overrule, I guess it's a request by the defense

11   for me to include a two-level reduction for acceptance of

12   responsibility in the guidelines calculation. That's really

13   not an objection to the PSR, but I am not going to do that in

14   connection -- and I didn't do it in connection with my

15   independent calculation.

16       All right. Next, paragraph 13 is again an objection

17   to the use of the $13 million gain in connection with

18   calculation of the offense level. I've already ruled on that.

19       Paragraph 13 also previously referred to Ms. Giannelli

20   as a co-owner. That has been resolved.

21       Defense objects to paragraph 117. This is the

22   two-level enhancement for sophisticated means. I've already

23   ruled on that.

24       Defendant previously objected to paragraphs 132, 133,

25   139, 141, and 145, which had details about Ms. Giannelli's

M98VGIAS

1    personal life.  I believe those have all been revised.

2             Mr. Fasulo?

3             MR. FASULO:  We withdraw on -- I'm sorry, just so the

4    record is clear, I withdraw on paragraph 132 the objection; I

5    withdraw the objection on paragraph 133; I withdraw the

6    objection on paragraph 141, as all being revised; I also

7    withdraw the objection on paragraph 145.

8             THE COURT:  What about 139?

9             MR. FASULO:  I'm sorry.  I thought I said -- 139 as

10   well, Judge.

11            THE COURT:  Okay.

12            So withdrawn on 132, 133, 139, 141, and 145.

13            MR. FASULO:  Correct, as the paragraphs have been

14   revised.

15            THE COURT:  Okay.

16            All right.  Next, the defendant objects to paragraph

17   154, which states that Ms. Giannelli's drug test was positive

18   for Codeine.

19            MR. FASULO:  Based on the Court's -- I'm sorry.  I

20   didn't mean to interrupt.

21            But based on what the Court's understanding is, I

22   don't believe this should be an issue here.  We stand by what

23   we reported to the Court in our documents.

24            Ms. Giannelli is very anti any kind of drugs, as we

25   all were aware on the defense side during the COVID times.  So

M98VGIAS

1   we are very clear that this is not necessary for us to go any

2   further.

3          THE COURT:  Not necessary?

4          MR. FASULO:  To have a hearing or to go further into

5   this issue in front of the Court.

6          THE COURT:  All right.

7          So the objection to the PSR is overruled.  It's a

8   factual recitation about what happened.  But this paragraph

9   should be modified, and the judgment will reflect it, to

10  reflect that a second drug test was taken and came back

11  negative.

12         MR. FASULO:  That's acceptable to the defense, Judge.

13         MS. MORTAZAVI:  No objection.

14         THE COURT:  Okay.

15         All right.  And then finally, there were objections to

16  paragraphs 156, 160, 163, 165, and 167, all regarding

17  Ms. Giannelli's work history, her income, her residences, and

18  the like.  I believe those have all been addressed, but,

19  Mr. Fasulo, I'll give you the opportunity to review and let me

20  know.

21         MR. FASULO:  Yes, Judge.

22         Paragraph 156, we will withdraw objection as it has

23  been revised; paragraph 160, we will withdraw our objection as

24  it has been revised; paragraph 163, we also will withdraw the

25  objection as it has been revised; and I think paragraph 165,

M98VGIAS

1    your Honor, as well, has been revised and we will withdraw the

2    objection as to paragraph 165.

3            THE COURT:  All right.  What about 167?  I think the

4    specific objection dealt with something about a house lived in

5    by her mother.

6            MR. FASULO:  Judge, our statement there --

7            THE COURT:  There's a footnote that's been added

8    apparently.

9            MR. FASULO:  Let me double-check the footnote, Judge.

10           I have here that we accept the --

11           THE COURT:  Footnote 8 has been added.

12           MR. FASULO:  I just want to make sure that it's

13   correct.  I have that it's correct on my notes.  Judge,

14   footnote 8 is correct; and with that footnote, we will withdraw

15   our objection as to that paragraph.

16           THE COURT:  Okay.

17           All right.  I have a question for you I should have

18   asked in connection with this paragraph though.

19           The home at 125 Jennifer Lane, we heard about that

20   during the trial.  This reflects "joint" after the address.

21   What does that mean?

22           I had understood from the evidence at trial that

23   this -- and from the PSR and other -- your submission that this

24   home was purchased by Ms. Giannelli and the mortgage was paid

25   off using proceeds when her father died.

M98VGIAS

1          MR. FASULO:  Yes, your Honor.

2          However, they were married -- since that time, she did

3     get married and the house is now jointly owned between her and

4     her husband.

5          THE COURT:  The title has been changed?

6          MR. FASULO:  The title has been changed?

7          Yes, I believe so, your Honor.

8          THE COURT:  Okay.  Thank you.  All right.

9          And then the residence for Ms. Giannelli's mom, is it

10    held in both names or was it a gift?

11         MR. FASULO:  Judge, I believe that that residence —

12    I'll just confer — that that residence is held in three names,

13    which is the mother's name and the siblings' names, which are

14    both in court here today.

15         THE COURT:  Okay.

16         MR. FASULO:  I'm sorry.  Gus, her husband, and Lisa's

17    name.

18         THE COURT:  Okay.  All right.

19         And then I had a question about one more property

20    that's listed here that I've never heard anything about.

21         MR. FASULO:  The Roatan property, which was bought by

22    both Gus and Lisa out of the country.

23         THE COURT:  Okay.

24         MR. FASULO:  It's a small piece of property in

25    Honduras.

1          THE COURT:  And then it says Helene.  What is that?

2     Is that a place in Honduras?

3          THE DEFENDANT:  It's a town.

4          THE COURT:  Okay.  Thank you.

5          MR. FASULO:  A place in Honduras.

6          THE COURT:  Okay.  All right.  Thank you.

7          MR. FASULO:  That is all the property, Judge.

8          THE COURT:  I appreciate the clarifications.

9          All right.  Are there any other objections to the PSR

10    that we have not dealt with?

11         MR. FASULO:  No, Judge.  I think we have dealt with

12    all of the defense objections.  No, I know we have dealt with

13    all the defense objections.

14         MS. MORTAZAVI:  And nothing from the government.

15         THE COURT:  All right.  Then in terms of the

16    calculations, my calculations do accord with what is set forth

17    in the PSR.  Specifically, the base offense level is 6 under

18    Section 2X1.1(a), 2N2.1 and 2B1.1(a)(2).

19         Turning to specific offense characteristics, I have

20    added the 20 points, pursuant to Section 2B1.1(b)(1)(K),

21    because there is a loss that cannot reasonably be calculated,

22    and the gain from the offense is between 9.5 and 25 million.  I

23    have also added two points for sophisticated means pursuant to

24    Section 2B1.1(b)(10)(C).

25         I am not adding an enhancement for obstruction of

M98VGIAS

|    | |
|----|-|
| 1  | justice, and I am not reducing the calculation for acceptance |
| 2  | of responsibility, resulting in a total offense level of 28, |
| 3  | Ms. Giannelli's criminal history category is I, that produces a |
| 4  | sentencing range calculation of 78 to 97 months.  However, as |
| 5  | I've discussed with counsel, the statutory maximum is 60 |
| 6  | months, and I find, as did the PSR, that the guidelines |
| 7  | sentence is, therefore, 60 months. |
| 8  | With the relatively minor modifications that I've made |
| 9  | that we've talked about, the PSR will be made part of the |
| 10 | record in this matter.  I do object -- I'm sorry, adopt the |
| 11 | PSR, the factual findings, and the guidelines calculations made |
| 12 | therein.  It will be, as I say, part of the record in this |
| 13 | matter; it will be filed under seal.  Should an appeal be |
| 14 | taken, counsel on any appeal may have access to the PSR without |
| 15 | any need for further application to the Court. |
| 16 | All right.  Does either side need a break at this |
| 17 | point? |
| 18 | MR. FASULO:  I actually -- Judge, you read my mind.  I |
| 19 | was actually going to request a short break just to speak with |
| 20 | counsel.  Mr. Huot is going to lead the discussion on the |
| 21 | sentencing.  I would like a moment to discuss. |
| 22 | THE COURT:  All right.  So why don't we take -- is |
| 23 | that all right with the court reporter?  All right.  So why |
| 24 | don't we take a brief break, and we'll reconvene in about five |
| 25 | minutes or so. |

M98VGIAS

1          MR. FASULO:  Thank you, your Honor.

2          THE COURT:  Thank you, everyone.

3          (Recess)

4          THE COURT:  All right.

5          Does the government wish to be heard?

6          MS. MORTAZAVI:  Yes, your Honor, briefly.

7          Now, your Honor, I don't want to belabor my remarks

8    today, because this Court has sat through now two trials and

9    two sentencings involving the conspiracy that is the subject

10   matter of this proceeding here today.  And so the Court is well

11   aware of the record and well aware of the government's position

12   regarding the facts here.

13         And there's no doubt, upon reviewing the defendant's

14   submission, that the defendant has a troubled background, which

15   the government recognizes, acknowledges, and is sympathetic to.

16   That background, however, does not mitigate the seriousness of

17   the offense conduct in the eyes of the government.

18         The offense conduct was serious.  It came later in the

19   defendant's life, when she was an adult, when she was making

20   deliberate choices over a long period of time to engage in

21   criminal activity.  That criminal conduct touched hundreds of

22   trainers and led to the doping of potentially thousands of

23   racehorses and the corruption of many races.

24         It was serious conduct, it was dangerous conduct, and

25   it was conduct that the defendant persisted in for well over a

M98VGIAS

decade, approaching two decades.  And it was conduct that she

facilitated not only by her own active efforts to perpetuate

the conspiracy with all of the factors that we've set out in

our submission and at trial, but also by her deliberate

attempts to mislead others who might stop her from her criminal

conduct.  That deserves serious consideration by this Court,

and that merits a guideline sentence.  It does not mean that a

below guideline sentence is warranted, nor does it mean that

the defendant should get the nonincarceratory sentence that she

seeks.  That simply would not address the seriousness of the

offense.

          The defendant claimed credit in her objections to the

PSR which the Court overruled for her acceptance of

responsibility.  And I want to reiterate that there was no

basis to credit the defendant for admitting to her crimes after

she was convicted.  Acceptance of responsibility are for those

who stand up and admit to their crimes freely and are, thus,

convicted by their plea.  It does not reflect acceptance for

the defendant to hold the government to its burden of proof at

trial, wait until she's convicted, and then provide

mealymouthed explanations for why she engaged in the offense

conduct.

          This defendant wants to stand here today and say that

she is now accepting responsibility for her crimes; but that

simply does not reflect the record that we have, the reason we

M98VGIAS

1    went to trial, and where we sit today.

2            This Court should also take seriously the defendant's

3    false testimony at trial.  I understand the Court's ruling on

4    the obstruction of justice enhancement and none of my comments

5    are intended to respond to that ruling, which we understand.

6            But in terms of the 3553(a) factors, we think that the

7    Court should take seriously this defendant's attempts to sway

8    the outcome of her trial by testifying falsely.

9            She testified falsely in two respects.

10            First, her claim that she did not know which drugs

11    were prescription drugs was a blatant demonstrable falsehood.

12    It simply defies logic that someone who spent over ten years

13    ordering prescription drugs, fulfilling orders for prescription

14    drugs, even noting the names of horses on prescriptions to be

15    submitted to pharmacies or to be attached to bottles, that

16    someone in that position would not know which drug was a

17    prescription drug or not.

18            And falling from that, the defendant's explanation

19    that she credited an explanation to her by Seth Fishman that

20    there was an open prescription to be applied to any client who

21    requested any drug for any horse at any time is simply

22    unbelievable.  It defies logic to suggest that the defendant

23    would have believed that.

24            And so what we are left with is a defendant who took

25    the stand in her own defense in an attempt to curry sympathy

1     and sway the jury with self-serving false statements.  I think

2     that too should be taken into this Court's consideration in

3     determining the appropriate sentence here.  That instead of

4     accepting responsibility and instead of freely admitting her

5     crimes and truthfully testifying to her role in them and

6     leaving it to the jury to decide, she made deliberate attempts

7     to influence the outcome of her trial.  They were ultimately

8     unsuccessful because of the weight of the government's proof,

9     but certainly they were calculated at earning an acquittal.

10            Because of the extent of her conduct, because of the

11    deliberate acts that she took to deceive and mislead which were

12    at the heart of that conduct, and because of the steps that she

13    took at her own trial to deceive and mislead, again, we believe

14    that a guideline sentence of 60 months' imprisonment is

15    appropriate here.

16            THE COURT:  All right.  Thank you.

17            All right.  I'll turn to the defense.

18            Mr. Fasulo, did you tell me Mr. Huot --

19            MR. FASULO:  Yes.

20            Judge, if I just may have one moment with the Court.

21            THE COURT:  Sure.

22            MR. FASULO:  So I just want to be clear that we are

23    aware of the 3553(a) factors.  We have isolated --

24            THE COURT:  I assumed you were.

25            MR. FASULO:  But in our submission, we have isolated

M98VGIAS

the points that we think are relevant to what we believe we'd
like the Court to focus on.  But we understand the Court is
going to focus on all the 3553(a) factors even though they were
not addressed in our application.

However, this Court has sat not only through this
trial, but through this pretty huge case with many different
defendants and different counts.  The Court is aware of the
charges, the government's position.  The Court is also aware of
what our case was and sat through the evidence.  We are not
going to go through any of the government exhibits in this
application.  We are relying on the Court's familiarity with
the case and their attention to the matter to make their own
determinations on that.

As defense counsel and as defendant understand the
jury's verdict, we respect the jury's verdict.  We disagree
with the jury's verdict obviously; we wouldn't have tried the
case.  But we understand the jury's verdict and we accept the
jury's verdict.  It's their voice that speaks as to the
underlying facts in this case, and so I understand that.

We would like to address today both the government's
statements on -- their oral statements made in court just a
moment ago, and we also would like to address what we have in
our sentencing submission to some extent.

I think the only thing I'd like to say about the
government's application that they just made in terms of the

M98VGIAS

open script process, which is the following:  Which is that the

fact of the matter is that the only person who can prescribe

medications is a doctor.  And, in fact, the doctor was on the

AVImark system.  The doctor was receiving the benefits of all

of the sales that were going on.  He was aware of the

dispensation of all of the medications through the Equestology

company as a whole.

What you would call that and what that role would be

in the use and the distribution, to me, it does fall upon the

doctor to say this can't happen or this can happen.  In fact,

we are not saying that -- what Ms. Giannelli testified to at

trial is what she testified to; that was her understanding.

But I don't think that we can look at this as a case where

Ms. Giannelli is operating in Delaware, and Dr. Fishman is out

of the picture and has no idea of the revenue, the sales, the

products that are being dispensed on his behalf by

Ms. Giannelli.

So I just think that that clarity needs to be involved

in what her understanding was about the doctor's role in this

as well, in terms of the scripts or the prescriptions that were

going to be dispensed.

And other than that, Judge, I would turn -- as you

know, Mr. Huot was ready to try both cases with us; and for

unforeseen circumstances, we were not -- COVID-related

circumstances, it didn't happen.  But he's worked really hard

1    on this case — we both have — and has a very good relationship

2    with Ms. Giannelli. And on that behalf, I would like Mr. Huot

3    to address the Court as to the factors laid out.

4    And if the Court has any questions on the trial part

5    of the case in any way, I'd be glad to jump in, but I don't

6    plan on doing so. Mr. Huot is well-prepared to do this right

7    now.

8    THE COURT: All right. I'm happy to hear from

9    Mr. Huot on behalf of Ms. Voshell.

10    MR. HUOT: Thank you, your Honor.

11    Your Honor, I'd like to start by just introducing some

12    of the friends and family --

13    THE COURT: Sure. I do see there's a large number of

14    people here.

15    MR. HUOT: Most of these people came up all the way

16    from Delaware just to be present to support Ms. Voshell, so

17    we're very appreciative of that.

18    In the gallery here, you can see --

19    THE COURT: Counsel, can I ask you, do you want to go

20    from the podium? Because you're sort of blocking my view of

21    the people you're introducing to me.

22    MR. HUOT: Absolutely.

23    THE COURT: Thank you.

24    Are you comfortable going from here?

25    MR. HUOT: Certainly.

M98VGIAS

1          THE COURT:  Okay.  I think that works better all the

2     way around.

3          MR. HUOT:  I think so too, your Honor.

4          THE COURT:  Okay.  Thank you.

5          MR. HUOT:  Okay.  So present in the gallery today we

6     have Gusty Voshell, who, as you know, is Ms. Voshell's husband.

7          THE COURT:  I do.  Good afternoon now.

8          MR. HUOT:  Kali Voshell, who is a daughter-in-law;

9     Tyler Voshell, who is a son-in-law; his girlfriend, Ashley

10    Mogle; Sheila Dennis, who is Ms. Voshell's mother; Dot Rodgers,

11    who is one of her mother's friends and who is here to support

12    her.  As, I believe, the Court is aware from the second

13    submission from Ms. Dennis, her husband passed away just in the

14    last week or two.

15          THE COURT:  I'm very sorry.

16          MR. HUOT:  Chris Hall is also present.  He's a friend

17    that works at the Indian Point Farms where Lisa currently

18    works.  Dave Melvin and Sharon Welsh are here; they are the

19    owners of Indian Point Farms.  And Steve and Sue Kessler are

20    present; they are friends from Florida.

21          THE COURT:  All right.  Thank you all for being here.

22    It is important that Ms. Voshell have your support.  And I have

23    read all of the submissions from everybody on her behalf and

24    appreciate the input.

25          Go ahead, Mr. Huot.

M98VGIAS

1          MR. HUOT:  Thank you.

2          So I'd like to start by just responding to a few of

3     the things that the government has raised in the course of the

4     proceeding today, and then there are a few things in their memo

5     that I would just like to address briefly.

6          On the issue of acceptance of responsibility, this

7     isn't a situation where Lisa is here after having been caught,

8     after having been found guilty and saying, Okay, you're right,

9     now I'm sorry.  Lisa maintains that she never acted with intent

10    while she was acting in this case.  She's not here today to

11    say, When I was doing these things for Dr. Fishman, I was doing

12    them on purpose.  She still wasn't acting intentionally.  She

13    did all these things, but she did not --

14         THE COURT:  Respectfully, though, the jury found the

15    opposite.

16         MR. HUOT:  I understand that, your Honor.  And that's

17    the jury's verdict.  But the jury isn't privy to the inside of

18    Ms. Voshell's head.  They don't know her background; they don't

19    necessarily know her total state of mind and what may lead her

20    to see the world the way that she sees it or to take the

21    actions the way that she does.

22         When the government talks about Ms. Voshell lying on

23    the stand, they said she did so, and it was demonstrably false,

24    that was their words, that it was demonstrably false.  But I

25    haven't seen them introduce any evidence to demonstrate that

M98VGIAS

what she said was false.  They followed up that claim with

their own opinions about why no reasonable person would have

done all of these things.

        In their memo themselves, I believe the words they

used were "it defies reason."  Just because it defies reason to

the government, doesn't mean that it defied reason to

Ms. Voshell at the time that she was acting.

        Ms. Voshell is a high school graduate.  We don't need

to get back into the nitty-gritty of her background before she

graduated from high school, but needless to say, at the time

she graduated high school, she had a heck of a lot of baggage

with her.  She went from there and got involved with Bruce

Ranger, who works in the horse industry.  And that was, you

know, kind of her first learning experience in that world.

        From there, up until the time she got with Dr.

Fishman, she learned from the people she worked with.  That's

where all of her experiences are from.  From what she saw, it

was a loose industry.  She was just doing things based on the

way she had had seen it done.

        When she was -- back in the '90s, you know, the

government points to the baking soda infraction.  You know, at

the time that happened, Lisa was fined $100 and suspended for a

few days.  She had no other infractions since.  This isn't a

person who has three decades of history of violating race

rules, of fixing races, like some of the government witnesses,

or of doing really anything of that nature.  When she worked

with Fishman, she dealt with products, not the animals.  And

beforehand, she was working with people who were instructing

her on what she should be doing and who were basically teaching

her the business and teaching her how things worked.  She saw

firsthand vets come into barns, teach people how to give shots.

You know, she lives in Delaware where there are

Tractor Supply stores, and she can walk down the aisle and see

any number of a lot of these medications.  Now, of course, that

doesn't go for the Dr. Fishman special products and the PEDs

and that part of the case.  But a lot of what Ms. Voshell dealt

with — in fact, most of what she dealt with — were not those

types of products.

There was a lot going on here that seemed very normal

to Ms. Voshell.  There are some things that were going on that

we agree and she agrees, looking back, should have raised flags

to her, and she wishes that she handled things differently.

But as far as what the acceptance of responsibility is

for Ms. Voshell, she accepts the jury's verdict.  She

understands that she broke the law.  She very much regrets all

of her actions.  But she is not prepared to come here today and

say that she knew she was violating the law the whole time she

was acting.

It's the same reason that this case went to trial.

Ms. Voshell was never given an opportunity -- she was never

going to be able to allocute to the Court that she knew what

she was doing was wrong.  So I just want to make that clear.

And I think that all of the letters that support that, these

aren't letters that say Lisa didn't break the law.  I think

everybody understands that Lisa was convicted by a jury and

that they found -- we get it, they found the intent element.

But from the people that know her best, that have, you know,

spent their lives with her, they too support her and believe

that she didn't know what she was doing was wrong at the time.

        Lisa's life experiences are much different than my

life experience or government's counsel life experience.  So to

say that, you know, her mental state defies reason, I just

think is -- I just think it's not accurate.  And I think that

we need to look at the perception that Lisa had on the world

based on where she came from, based on where she lives, based

on who she worked with, who she learned from, to try to get an

idea of how she saw things, not just how we think she should

have seen things.  And I think all of us in this courtroom can

look at some of this stuff and say, Yeah, that seems weird.

        I mean, the open script in particular, right, I

understand that the government thinks that that's completely

ridiculous.  But when Lisa is instructed by her licensed

veterinarian boss, who gets a letter sent to him by the vet

board every year saying that he remains in good standing, and

he tells her if it's in the AVImark system, it's an open script

and anybody could have it, who is she to question him?  She

doesn't know any better.  She thought that that was fine.  As

silly as it may sound to you, I, or government counsel, she

thought that that was fine.  And that's kind of the theme of

all of what she was doing with Dr. Fishman.  She was following

his instructions.  And at the times where she should have

stopped and said, Is something going on here that shouldn't be

going on, she didn't.  But she was taking his lead.

            You saw from the submissions that some of the people

she worked for before were really not good people.  She had a

lot of terrible to traumatic work experiences.  She had a lot

of short-term work.  You know, you've seen Dr. Fishman quite a

bit, as much as anybody in here really at this point.  You've

seen how he carries himself.  He's a man of great confidence.

He has an ego.  He speaks with passion about what he does; and

he very much conveys a belief of, I'm doing what's right.  I

know what's right.  I know the rules.  I've studied this stuff.

These are the rules.

            Who is Lisa to look him in the face and say, Well, you

know, what do you know?  I know better than you.

            Because she didn't.

            And she took him at his word.  And that's something

that she'll need to live with for the time she did that and it,

you know, was against the law.  But Lisa took Dr. Fishman at

his word, just like she learned from all the people that she

1    worked with beforehand.

2            Lisa's background wasn't included in the sentencing

3    submission for the purpose of sympathy, it was included to

4    demonstrate to the Court and to the government where she comes

5    from and why she sees the world the way that she sees it.

6            Lisa had a much different upbringing than we did; and

7    much different, I would assume, than the 12 members of the jury

8    who were all people from the greater New York City area.  These

9    aren't farm people.  And this doesn't contest their verdict or

10   anything in any way, but they are not people that have the same

11   life experiences.  Just like you, I, the government, or many

12   other people, you know, we hear some of the stuff and it sounds

13   crazy to us.  And we say how could anybody do that?  This is

14   nuts.

15           But I think there's a large subset of people that are

16   more familiar with that world that don't think it's so black

17   and white and obvious.  And I think that Lisa, especially when

18   you factor in all of her prior experiences, to her it just

19   wasn't obvious.  Lisa thought she was doing good work.  Just

20   one example of, you know, the Government Exhibit 711, the

21   11-page or so brochure --

22           THE COURT:  I'm familiar.

23           MR. HUOT:  I'm sure you're very familiar with it.

24           You know, that's one of these examples of a time where

25   Lisa actually thought she was doing something good and helpful.

1    And it just absolutely bit her so hard, you know, she may not

2    be able to walk again as a result of it.

3        Lisa thought that because these people are always

4    calling and asking how to use these things, and she's been told

5    by Dr. Fishman, Well, you can't tell them how to use these

6    things, she asked Dr. Fishman to put this stuff in layman's

7    terms so she would have something to give to people when they

8    were asking about it, because he wasn't always able to be

9    reached on phone.  He was busy.  He would be overseas.  He

10   wouldn't pick up.  She thought what she was doing was helpful.

11   She thought that she was making it so these people could get

12   the information and find out how to use the drugs.

13       I understand — and I'm sure many of us in here would

14   say that seems crazy.  But when Lisa was doing it, that's where

15   her mind was.  Her mind wasn't -- she's not a money grubber.

16   You know, the government uses the language in here that she was

17   trying to line her pockets.  That's absolutely not what Lisa

18   was trying to do there in that instance or in any of these

19   other instances.

20       Lisa genuinely believed that she was helping people.

21   When she was saving people on shipping, she thought she was

22   helping them.  When she was calling somebody to say, Hey, you

23   know, if you're over this dollar amount, you get free shipping,

24   she thought she was helping them.  She didn't -- she wasn't

25   trying to, you know, stack cash under her mattress and just

pile up money hand over fist. I mean, you saw all of the
letters. I don't think there's a single letter in there that
paints Lisa as any type of money-grabbing person. In fact, I
think she is remarkably generous; certainly more generous, you
know, than most people that come through this courthouse as
defendants. You know, Lisa gave so much of what she had.

Lisa had to ask her mother just yesterday for $300 to
be able to come to court today. She had to borrow money from
family to pay for her hotel room during the trials, to take the
train here for both trials when she's had to come to court.
Lisa is not a person who is swimming in dough. And to say that
her actions were designed to line her own pockets just couldn't
be further from the truth. Were her actions illegal? Yes.
But the motive behind those actions was not one of greed, your
Honor.

As far as using Dr. Fishman's vet license without
authority, which is another point the government raises in
their submission, you know, the vet license was on file with
these pharmacies. It was sent there by Mary Fox or Courtney
Adams. It had to be updated every year. Dr. Fishman knew Lisa
was making the orders. The pharmacies knew Lisa was making the
orders. Lisa wasn't calling these pharmacies saying, Hey, I'm
a veterinarian. Sell me stuff. They knew that she was acting
on behalf of Dr. Fishman. The way that this is categorized by
the government is just a complete misstatement of the reality

M98VGIAS

1    of what was going on there.  Lisa wasn't going rogue; she

2    wasn't doing anything that she wasn't instructed to do.

3              Now, again, I'm not trying to downplay the jury's

4    verdict; I'm not trying to say that there aren't times that she

5    looks back and says, I wish I did this differently.  But at the

6    time she was acting and where her head was, she really didn't

7    think she was breaking the law.

8              I know the Court mentioned, when we were going through

9    the objections, a little bit about Courtney Adams.  And the

10   Court, you know, said something about not seeing Courtney Adams

11   and Lisa as kind of being on par with one another.  And I

12   understand that they are not totally on par with one another,

13   your Honor.  But as far as we can tell from the government's

14   submission, the main distinguishing factors between the two of

15   them are that Lisa worked for Dr. Fishman for many years,

16   longer than Courtney Adams; but Courtney Adams did work for

17   five years, which is not an insignificant amount of time, and

18   she did work out of his Florida office directly with him.  She

19   did also have to do with his overseas business, went to Dubai

20   with him.

21             But then on the other -- aside from the length of time

22   that she worked, the other distinguishing factor that the

23   government points to is Lisa's experience in the industry.

24   Courtney didn't work in the industry.  Lisa has been in the

25   industries for decades.  And that just goes back to kind of

M98VGIAS

what I've said already.

        The government can't have it both ways, your Honor.
The government wants to point to Lisa's history as the reason
that she knew everything she was doing was wrong; but they
refuse to look at Lisa's actual experiences while she was in
that industry.  They are looking at -- they are not looking at
what she went through and what she knew and what she learned.
And I think that's what the focus needs to be, not just the
fact that she worked in this industry.  She didn't work in this
industry with a bunch of shysters; she didn't work in this
industry with a bunch of cheaters.  I understand that some of
the people she was dealing with turned out to be both of those
things, but those were not the people that she was working with
or discussing what she was doing.

        It would be a whole different situation if Lisa, over
the course of 20 years, had been getting dinged for violation
after violation, but she hadn't.  So I don't think it's fair to
hold the fact that in the '90s, she was a licensed groom and
trainer against her today.  So much has changed in the '90s.
Like we said, when she was dinged for the bicarbonate, it was
$100 fine and a few days.  The idea of a federal case was
nowhere near anybody's radar.  She hasn't been a licensed
professional in this industry for decades at this point.

        And the one other thing that I just wanted to directly
respond to that was in the submission was the idea that Lisa

M98VGIAS

1    was still carrying on the business after Dr. Fishman was

2    arrested.  Lisa wasn't told that Dr. Fishman was arrested; he

3    was instructed not to discuss his arrest.  If she knew Dr.

4    Fishman was arrested, she wouldn't have kept working.

5              (Counsel conferred with defendant)

6              MR. HUOT:  Sorry, your Honor.  A little clarification.

7              THE COURT:  Okay.

8              MR. HUOT:  She knew that he was arrested, but she

9    didn't know the reasons he was arrested.  He had told her that

10   it had to do with an FDA issue and that it was something that

11   he was just going to clear up.  He didn't put any onus on Lisa

12   or tell her to stop doing anything.  She just followed his

13   instructions, and he blew it off as a nonserious, nonfactor

14   thing that he was just going to take care of.

15             On the issue of deception, your Honor, Lisa's had a

16   flag flying outside of her house that literally says

17   "Equestology" on it for years.  It was the pick-up and drop-off

18   site for FedEx, for UPS.  Everybody knew where Lisa was.  She

19   wasn't hiding from anybody.  She wasn't trying to conceal her

20   actions.  She full-on believed that everything she was doing

21   was on the up-and-up.  And if she didn't believe that, she

22   would have stopped doing it.

23             Unfortunately, Lisa's experiences made her think that

24   what she was doing was fine.  She knows now that it wasn't.

25   But that doesn't change the fact that when she was doing it,

1    she was just blind to some of these things, your Honor.

2              Thank you for your consideration.  If you have any

3    directed questions, we'd be happy to answer them.

4              THE COURT:  I do not.  Thank you.

5              All right.  Ms. Voshell, at this time you have the

6    right to address the Court if you would like to do so.  You

7    certainly don't have to.  But I'm happy to hear from you if

8    you'd like to speak directly to the Court.

9              If you're more comfortable staying seated, I'm fine

10   with that.  I appreciate your standing up.

11             THE DEFENDANT:  I first wanted to thank you for your

12   time and your patience with me.  This is just -- I'm scared to

13   death to be talking right now.

14             I wanted everybody to know it was never my intention

15   to break the law while doing my job.  I just -- it's been a

16   long two and a half years.  Everything in my world has been

17   shattered.  I have no solid ground underneath my feet.  I have

18   much shame about it.

19             I wanted to testify, and I mentally collapsed on the

20   stand.  I just went numb.  But the truth is very important to

21   me.  And it's always mattered to me, especially matters to me

22   in this Court, and I did speak the truth.

23             It was never my intention to hurt anyone or any

24   animal.  I wanted my heart to come out on the stand, and I

25   failed myself, my lawyers, and my family.

1           I'm just so sorry that this even had to be a case;

2    that, you know, it's -- everything in my world is upside down

3    right now.  I have -- everything I've known, all the people

4    I've known, it's just -- it's been false or it's just

5    disappeared.

6           It is true that, you know, I had to borrow money

7    multiple times from our family members.  I just -- I want to

8    make that right.  I just don't know, you know, moving forward,

9    if the Court will allow me to.

10          At this point I wish I never met Dr. Fishman.  I just

11   would have been so much better off if I had not.  But it was my

12   actions.  I just was so concentrating on doing my job

13   correctly, that I missed what was wrong.  I thought I was doing

14   good, I thought I was performing my job and doing it -- I never

15   knew it was not legal or what I was doing was even remotely

16   close to a line of the law.

17          I can't change my past, but I can change my future.

18   And I'm hoping, you know, if you allow me to, you know, I'd go

19   home and be with my husband and go to work tomorrow and start

20   making this right.  I'm just lost and I'm looking for guidance,

21   and I throw myself on the mercy of the Court.

22          THE COURT:  All right.

23          I thank you for your statement.

24          At this time it's my job to outline the sentence that

25   I intend to impose.  The attorneys will have a final

M98VGIAS

1    opportunity to make any legal objection before sentence is

2    finally imposed.

3            In weighing what is appropriate today, I started, as

4    I'm obligated to do, with the sentencing guidelines.  I've

5    already put on the record a summary of my guideline

6    calculations, so I won't repeat that now.

7            In imposing sentence, I have also carefully

8    considered, as I must, each of the factors set forth by

9    Congress in Section 3553(a).  These factors include the nature

10   and circumstance of the offense and the history and

11   characteristics of the defendant; the need for the sentence

12   imposed to reflect the seriousness of the offense, to promote

13   respect for the law, to provide a just punishment for the

14   offense, to afford adequate deterrence to criminal conduct, to

15   protect the public from any further crimes of the defendant; to

16   provide the defendant with needed educational and vocational

17   training, medical care or other correctional treatment in the

18   most effective manner.

19           As I've mentioned, I've done a guidelines calculation.

20   I've also, as I've discussed with you during my ruling on the

21   various objections, I have consulted policy statements and

22   notes issued by the Sentencing Commission.  I'm also mindful of

23   the need for any sentence to avoid unwarranted disparities

24   among similarly situated defendants.  I'm also directed to

25   consider the need for any sentence to provide restitution to

M98VGIAS

1    the victims.

2              I understand the government is not seeking restitution

3    in this case; is that correct, Ms. Mortazavi?

4              MS. MORTAZAVI:  Correct, your Honor.

5              THE COURT:  All right.

6              So I will say that this is a difficult case; it's a

7    difficult sentence for me to have to evaluate and to weigh

8    here.

9              I start, as I'm instructed to do by 3553, with looking

10   at the nature and circumstances of the offense of which

11   Ms. Giannelli -- Ms. Voshell has been convicted.

12             The offense is a serious offense.  And I appreciate

13   it's painful for you to sit here while I put on the record, as

14   I must, my reasoning.  So I'm going to say right at the outset

15   the seriousness of the offense, in the Court's view, warrants

16   an incarceratory sentence.  I cannot, notwithstanding the other

17   factors I'm going to talk about in a moment, impose a sentence

18   of probation, as Mr. Fasulo calls it in the submission.  It

19   wouldn't be probation, but that's the starting point.

20             After eight days of trial and hearing all of the

21   evidence, including the defendant's testimony, the jury here

22   convicted Ms. Voshell of Count Two, conspiracy to adulterate

23   and misbrand drugs with an intent to defraud and mislead.  This

24   was not a one-time offense; it was not a bad decision.

25             For 18 years, or the better part of 18 years, from

2002 to March of 20 -- 2020 -- I'm sorry, 2020, Ms. Voshell

marketed and sold what she knew were illegal, powerful,

performance-enhancing drugs.

        The jury's decision reflects that they rejected the

contention that Ms. Voshell did not know what she was doing and

did not have an intent to deceive.  She was involved in the

conduct giving rise to this conviction for longer than almost

any other defendant charged in this case.  As I say, it was not

a one-time aberrational act on her behalf.  The impact of the

offense was widespread.  There were hundreds of clients.  And

she sought to expand the universe of people to whom she sold

those dangerous drugs.

        In response to statements made by counsel,

Ms. Voshell's role was not an administrative role.  She did not

act as a mere administrative assistant or an aide to Dr.

Fishman.  She had her own clients.  She cultivated new clients.

She used Dr. Fishman's veterinary license to bulk-order drugs;

she had her own supply of illegal drugs in her garage; she

created marketing materials; she incorporated the company; she

cosigned bank accounts; she created, as I say, promotional

materials; she created an online record system that she

managed.  She was crucial to Equestology, its existence, and

its success.

        The evidence at trial reflects that Ms. Giannelli

affirmatively participated in peddling drugs that she knew were

1    going to be used to enhance performance.  She clearly knew that

2    some of those drugs required prescriptions, because she used

3    Dr. Fishman's veterinary license to purchase those drugs.  She

4    knew the drugs were banned on race day; and yet she talked and

5    labeled some of those drugs -- sold drugs that were labeled

6    with warnings about administer within X hours of an event of

7    strenuous exercise and sometimes even, it said, of the race.

8          It's not sufficient to say Ms. Giannelli's background

9    was that she grew up participating in an industry that was

10   loose.  That's like a kid saying to a parent, Well, everybody

11   else does it.  That doesn't make it right.  To say because she

12   only got a slap on the wrist or only got $100 fine for using

13   baking soda, she never dreamed there would be a federal case,

14   that's not an adequate response to the conduct in which she

15   engaged.

16         Ms. Giannelli was, at one point in time, licensed as a

17   groom; she was licensed as a trainer; she spent all of or much

18   of her years before she met Dr. Fishman working in the horse

19   industry.  This conduct is conduct, as the government points

20   out, that she engaged in during her adult life.  The drugs she

21   was involved with were powerful, they were dangerous.  They

22   could — and they likely, in the Court's view, did — injure and

23   perhaps kill horses.  At a minimum, peddling these drugs put

24   other horses, put the jockeys that were riding those horses at

25   risk of injury or death.  They cheated other trainers, other

jockeys, other owners out of rightful earnings.  And

Ms. Giannelli did earn significant amounts of money doing what

she did.  The jury rejected any argument that she did not know

what she was doing.

       The record is replete with evidence that belies any

sense that Ms. Giannelli didn't know what she was doing.  And,

in fact, she participated in a scheme, basically, with Dr.

Fishman to avoid detection of what was going on.  There's ample

evidence that she and Dr. Fishman vetted clients to be sure

they would act with discretion.  They worked to ferret out

potential snitches.  They asked around to see if potential

customers were trustworthy.  She joked with Dr. Fishman about

the absurdity of one client's request that drugs be delivered

to the racetrack.  All of that reflects that Ms. Giannelli knew

that what she was doing was not appropriate; that the drugs

were prohibited.

       She assured buyers that the drugs that they were

purchasing would not be testable.  And in the Court's view, the

record reflects that Ms. Giannelli was somewhat brazen about

the conduct in which she was engaging.  She did persist in the

conduct after some pretty clear warning signs.  Put aside the

$100 fine for using baking soda on a horse back when she was a

groom or a trainer or an assistant trainer.

       Most compelling to the Court is the evidence in the

record involving the 2011 Delaware investigation.  After

administering a deadly, unapproved drug that Ms. Giannelli and
Dr. Fishman sold to someone at this track in Delaware, a
complaint was filed.  That complaint suggested that
Ms. Giannelli was engaging in violations of FDA rules and
guidelines.  It was certainly enough to put you on notice that
what you were doing was problematic.

Significant to the Court is that you lied, you clearly
lied, in response to that Delaware inquiry.  You told the
regulators — and this was under oath.  There's a signed page at
the back in which you swore to the truthfulness of what you
said.  And you said, quote — this was through your lawyer, "I
do not sell drugs for Seth Fishman."  That was your whole job
responsibility.  You said it was "incorrect and irresponsible
to claim otherwise."  And you said, I am "nothing more than a
delivery person."  That's Government Exhibit 3000.

And then again at the interview, Government Exhibit
3100, you said, I'm just like a UPS driver.  I'm a delivery
person.

Those were clearly false statements.  But they should
have put you on notice that what you were doing was
problematic.

I think counsel, in his statement, backtracked a bit,
after first telling me that you didn't know Dr. Fishman was
arrested.  Clearly the record reflects that you did know he was
arrested, and that he told you there was an FDA problem.  And

M98VGIAS

1    again, you kept selling the same drugs that you were selling

2    all along.

3            I have to say, as well, that I do find the record

4    reflects -- I won't say a lack of remorse.  I believe -- I

5    sincerely believe you're remorseful, and I sincerely believe

6    you wish you had never met Dr. Fishman.  And I understand that.

7    And I believe that you are sorry for what you did.

8            But there still is a certain lack of acceptance of

9    responsibility.  I'm not weighing that heavily, because I think

10   it's a natural human instinct to try to say, I thought what I

11   was doing was right and okay.  But many of the letters reflect

12   the same theme, basically, that was played out at the trial and

13   rejected by the jury.  So I'm not going to say any more on that

14   subject.

15           I weigh against that, as I must under the sentencing

16   guidelines, the history and the characteristics of you,

17   Ms. Voshell.  I fully recognize you had a difficult upbringing.

18   The record reflects that your relationship with your father --

19   I'm not going to put a lot of details on the record.  Some of

20   this is under seal; I'm not going to put it on the record.  But

21   you obviously had a difficult upbringing; your relationship

22   with your father was difficult.  I'm happy for you that you

23   were able to make amends with him before he died.  Your parents

24   divorced when you were relatively young.  You endured some

25   fairly traumatic life experiences, for which I am -- they are

1    heartbreaking.

2            But the record reflects that you are a strong person;

3    you did persevere; you are an independent woman.  You now, as

4    best I can tell, from what I've seen during the course of the

5    trial and from all the people who are here supporting you and

6    the letters that I have received, you seem now to be in a good

7    place in your personal life.  I'm not talking obviously about

8    this trial; but you have a loving family, you have a lovely

9    home, you have many, many people who love and care about you.

10           The letters I received paint a picture of a person

11   who's kind, a person who's giving, a person who's loving.

12   Clearly you're a hardworking person.  And you worked hard at

13   the job that brought you here before us.  But you've worked

14   hard since.  It's commendable that while all of this was going

15   on, you found jobs for yourself, you tried to work hard and

16   continued to work hard.

17           I'm most struck by the letters all reflect that

18   obviously you are a kind person, you are a good person, you are

19   a person who tries to help other people, and has a passion for

20   trying to make things better.  I'm just going to mention a few

21   stories that people told that jumped out at me and that really

22   moved me, I have to say.

23           Your efforts to help your niece with her health

24   issues; the fact that during COVID, you and your husband gave

25   your COVID stimulus money to people overseas who are in need;

1   your anonymously giving money to help people in need; buying a

2   wheelchair or paying for a vehicle to help transport a

3   wheelchair for somebody who needed it; arranging an Easter

4   party for handicapped kids; paying for treatment for friends

5   and family members who needed it; paying off bills in stores

6   after people left and had bills remaining; paying for trips for

7   a teenager to go on a mission trip overseas.

8           These are all extraordinarily generous, kind,

9   remarkable things that make me believe you truly are a person

10  with a good heart.  It seems that you see problems and you work

11  to fix them.  You've created a loving home for your husband and

12  for his kids, even honoring the memory of their mother.  I note

13  your volunteer work at your church and elsewhere.  I note, as

14  well, that you have no criminal history whatsoever.  And I

15  note, too, that you have many, many people who love and support

16  you.

17          In evaluating all of the 3553(a) factors, in addition

18  to what I've just discussed, I've looked at all the factors.

19  Particularly relevant here though are the need for any sentence

20  to reflect the seriousness of the offense, to promote respect

21  for the law, to provide just punishment, to afford deterrence.

22  At this point, I don't believe there's a need for specific

23  deterrence; I believe that you won't ever do this again.  I

24  think it's sad that you say you don't ever want to deal with

25  horses.  It seems you've had a lifelong love for them.  I don't

M98VGIAS

know that that's necessary, but I'm not going to comment on
that.  I do think it's wise for you not to work in the
industry.  But I don't believe there's a need for specific
deterrence.  There is, however, a large need for general
deterrence, and I need to take that into account.

I'm also mindful of the fact -- as I said at the
beginning, there needs to be, because of the seriousness and
the longevity of the offense involved here, a term of
imprisonment.  I'm mindful that that may provide educational
and vocational training which might be useful to you down the
road.

I want to comment, finally, on the need to avoid
sentencing disparities.  I'm very well aware of the involvement
of each of the defendants who are named in this case; each of
those defendants whom I've sentenced, those whose sentencings
are pending, I'm mindful and aware of the relative culpability
of everyone involved here, their individual offense conduct,
the extent to which they stepped up and accepted
responsibility.  And I have taken that into account in trying
to fashion a sentence here.  I'm going to comment on only a
few, most particularly because you have raised them.

Jordan Fishman, who was convicted of the same
conspiracy -- who was named as a co-conspirator in the count in
which you were named and of which you have now been convicted,
he did compound some of the drugs at Dr. Fishman's

1    specifications.  He didn't sell those drugs to users; he didn't

2    solicit customers.  His involvement spanned a much lesser

3    period of time.  He did accept responsibility and plead early

4    in this case.  It's my recollection that he pled to the

5    substantive offense, not to a conspiracy.  His guidelines range

6    was much, much lower than your calculated guidelines range.  I

7    sentenced him within the guidelines range applicable in his

8    case and on the facts before him.

9              As you know, Dr. Fishman was sentenced to the

10   maximum -- statutory maximum on the count on which you and he

11   have both been convicted.  The other counts are not really

12   relevant for avoiding sentencing disparities.

13             Mr. Dane will be sentenced tomorrow.

14             Considering all of this, the guidelines range and all

15   of these 3553(a) factors, as I say, I find that a sentence of

16   incarceration is warranted here; and it's the judgment of the

17   Court that a sentence below the guidelines range is

18   appropriate.  I am doing that largely by reasons of your

19   personal characteristics as I've tried to outline them on the

20   record, and the clear impact that all of the letters of support

21   have had on me.  I do think to some extent they mitigate

22   consideration of the seriousness of the offense conduct.

23             But, nevertheless, I do find that a period of

24   incarceration is warranted here.  And it is my intent to

25   sentence you to a period of 42 months in prison, which is a

M98VGIAS

1    downward variance from the guidelines range.  I'm not obligated

2    to sentence within the guidelines range.  I have set forth on

3    the record all of the reasons that I think a below guideline

4    sentence is appropriate in this case.  I find that sentence is

5    sufficient, but not greater than necessary, to serve the goals

6    of sentencing as set forth in Section 3552(a)(2).

7         It would be my intent to also impose a period of

8    supervised release of two years, following when you are

9    released from prison.  During that period, the mandatory and

10   standard conditions of release that are set forth in the PSR at

11   pages 50 and 51 would be in effect.

12        I would also impose the special conditions outlined in

13   the PSR, including that you would be supervised by the district

14   in which you are residing; that you would be obligated to

15   provide the probation officer with access to financial

16   information; and that you may not incur new credit charges or

17   open any additional lines of credit without approval of

18   probation, unless you have complied with the installment

19   payment schedule that will be included in the judgment in this

20   case.

21        You would also be obligated during the period of

22   supervised release to submit your person or any property,

23   residence, vehicle, papers, computer, or other electronic

24   communications, storage devices, cloud storage or media and

25   effects, to a search by any United States Probation Officer;

M98VGIAS

1   and, if needed, they could enlist law enforcement to assist

2   with that search.  Any search would be conducted only when

3   there's reasonable suspicion concerning a violation of a

4   condition of supervision or unlawful conduct by you.  Failure

5   to submit to a search would be grounds for revocation of

6   release.  You would be obligated as well to warn anybody else

7   who lives in your premises, that the premises may be subject to

8   search pursuant to this condition.  Any search could be

9   conducted only at a reasonable time and in a reasonable manner.

10          Probation has also proposed the condition that if,

11  based on your criminal record, your personal history and

12  characteristics, they believed while you were on release that

13  you posed a risk to another person, including any other

14  organization, the probation officer, with prior approval from

15  me, the Court, could require you to notify the person about the

16  risk and you would have to comply with that instruction.

17  Probation then could contact any person and confirm that notice

18  has been given.

19          As I said, I would also continue the condition I

20  imposed in connection with your release on bail, that you

21  comply with the rules and regulations of any licensing regime

22  to which you are subject, including appearance at any

23  disciplinary proceedings, if required, consistent, of course,

24  with any constitutional rights you may have.

25          There is also a special assessment of $100 per count.

1    That is mandatory and payable immediately.

2              The guidelines range for fine for the offense of which

3    you've been convicted is 25,000 to $250,000.  The Court's view

4    is that a fine in the amount of $100,000 is appropriate.  The

5    government is not seeking restitution and none will be ordered.

6    With respect to forfeiture, as we've previously discussed, it

7    is my intent to impose forfeiture in the amount of $900,000.

8              Does the government know of any reason why sentencing

9    may not be imposed as I've outlined?

10             MS. MORTAZAVI:  No, your Honor.

11             THE COURT:  Does the defense know of any legal reason

12   why sentence may not be imposed as I've outlined?

13             MR. FASULO:  No, your Honor.

14             THE COURT:  All right.

15             MR. FASULO:  The defense does have a request, your

16   Honor.

17             THE COURT:  One moment.

18             All right.  Mr. Fasulo.

19             MR. FASULO:  The defense requests a voluntary

20   surrender date.  In addition, the defense requests that the

21   defendant be sentenced -- that the Court recommends to the

22   Bureau of Prisons -- understanding that they don't control the

23   Bureau of Prisons, but they recommend that the incarceration be

24   close to the Delaware area so that she can keep contact with

25   her family members.

M98VGIAS

1          THE COURT:  All right.  I certainly have no issue with

2     that.

3          But no objection to sentence being imposed as I've

4     outlined?

5          MR. FASULO:  No objection, Judge.

6          The only thing I just wanted to -- I know that there

7     was a special condition that the Court talked about, which was

8     that the probation department, if Lisa was to work somewhere,

9     has a right to go to the Court to ask for notification.

10          I just wanted to be clear that it's our hope that when

11     Lisa does get out, she can continue working with animals again;

12     and that in some way, that does not infringe on what really was

13     her lifelong passion and where her skill set is.  So it's

14     fearful for me sometimes in terms of administratively,

15     probation reading into that.  So I would just appreciate the

16     Court understanding that's Lisa's whole life, and that --

17          THE COURT:  I do understand that.  That was my comment

18     actually that I made.  I thought I read something reflecting

19     that you didn't intend ever to work with animals again.  And I

20     said I find that sad and I hope it's not the case.

21          MR. FASULO:  And my only point is that for various

22     reasons, I understand -- your Honor, you can understand that,

23     but another judge may be sitting and making that ruling would

24     think that there was a different understanding at the time of

25     sentencing, that it was the intent of the Court that she not

M98VGIAS

1     ever work with animals again.  And I just want to make sure

2     that's at least in the record in case another judge has -- the

3     judge moves up or whatever the reason, is not here to be here

4     to make that judgment, that some other judge has that

5     understanding from this Court as to what your desire was,

6     that's all.

7              THE COURT:  Ms. Mortazavi, anything from you on that

8     condition which was proposed by probation?

9              MS. MORTAZAVI:  I have no objection to that condition,

10    your Honor, or the clarification requested.

11             THE COURT:  All right.

12             I will tell you, Mr. Fasulo, that when I read the

13    proposed special conditions, I questioned myself what it was

14    about, and we reached out to probation.  My understanding of

15    its purpose is consistent with what you're outlining here.  It

16    would not prevent Ms. Voshell from working in the future with

17    animals.  My special condition about complying with licensing

18    regimes remains in place.  But I don't think that's the intent

19    of that condition.

20             MR. FASULO:  I just wanted clarification on that,

21    Judge.  That was my understanding, and we do not plan on any

22    licensing or dealing with the racetrack industry.  But with

23    horses themselves is a different issue.

24             THE COURT:  All right.

25             So there being no objections to the sentence -- no

M98VGIAS

1    legal objections to the intended sentence as I've outlined it,

2    Ms. Voshell, would you please stand.

3            It is the judgment of the Court that you be

4    incarcerated for a period of 42 months, to be followed by a

5    period of supervised release -- excuse me one minute.  A period

6    of supervised release of two years.  The mandatory standard

7    conditions outlined in the PSR and the special conditions that

8    I put on the record will be in place during those two years

9    following your release from incarceration.

10            I am imposing a mandatory special assessment of $100

11   that is payable immediately.  I'm imposing a fine of $100,000.

12   And I will sign an order of forfeiture in the amount of

13   $900,000, consistent with the discussion that we had on the

14   record earlier.  No restitution will be ordered in this case.

15            All right.  You may be seated.

16            You should understand, Ms. Voshell, that the

17   designation to a particular facility is not made by the Court.

18   Which facility you will be told to report to is entirely within

19   the control of Bureau of Prisons, who requests that judges not

20   ask for specific facilities.  But I will make a recommendation

21   that they please endeavor to find a facility that is close to

22   your home.

23            I also agree that Ms. Voshell is a worthy candidate

24   for voluntary surrender, so I will direct you to surrender on

25   January 9th --

M98VGIAS

1          MR. FASULO:  Thank you, your Honor.

2          THE COURT:  -- at whatever facility is designated by

3     the Bureau of Prisons.  If for any reason you haven't heard

4     from the Bureau of Prisons, Mr. Fasulo, by that date, you'll be

5     back in touch with the Court.

6          MR. FASULO:  I will, your Honor.

7          THE COURT:  All right.

8          I assume there are no open counts to be dismissed.

9          MS. MORTAZAVI:  I believe Count Two in the original

10     indictment remains open, and I would move to dismiss that

11     count.

12          THE COURT:  All right.

13          MR. FASULO:  On consent, Judge.

14          THE COURT:  All right.  Count Two of the original

15     indictment is and will be dismissed.

16          Ms. Voshell, I need to advise you now that you have a

17     right to appeal from your conviction and from the sentence that

18     I've imposed.  If you're unable to pay the costs of any appeal,

19     you may apply for leave to appeal *in forma pauperis*.  Any

20     notice of appeal must be filed within 14 days of the date of

21     the Judgment of Conviction, which will be filed, if not by the

22     end of the day today, as soon as possible.  So you need to pay

23     attention to the time clock.

24          Before we adjourn, I just want to say a few words to

25     you directly.

1          I am sorry for you for the situation that's brought us
2    all here.  It is a very sad and difficult story.  I do believe
3    you are a good person.
4          Obviously you have the rest of your life in front of
5    you.  I hope that everybody who's supported you throughout all
6    of this, the people who are here to support you today, I
7    believe they will be there for you.  Rely on them.  Take
8    advantage of any educational or vocational training that might
9    be available to you at the facility to which you've been
10   designated.
11         Now is the time -- the record seems to reflect that
12   you've spent many, many years trying to help and care for other
13   people.  Now is the time for you to rely on your family and
14   your friends to help you through all of this.
15         As you said, you can't change the past, but you can
16   shape the future, and your whole life is in front of you.  Take
17   the time while you're incarcerated to try to get training, to
18   try to reflect on your plan for your life, because there will
19   be life after all of this.  You've assured me we won't see you
20   again in the criminal justice system.  I believe you.  I hope
21   that that is true.  I wish you all the best.
22         All right.  I thank our court reporter very much
23   and --
24         MR. FASULO:  Judge, just for the record, I know the
25   trial ended abruptly, and I wanted to at least on the record

M98VGIAS

1    thank your court staff for navigating us through the COVID time

2    and navigating this trial, both the first January trial and the

3    other trial.  I understand the difficulties that we were all

4    approached, but I think we handled it well, at least I think we

5    did the best we could.  But we wouldn't have been able to do it

6    without the support of your court staff.  And on the record I

7    think I'd like to just say that.

8             THE COURT:  I thank you for saying that.

9             I thank you all.

10            Anything from the government at all?

11            MS. MORTAZAVI:  Nothing, your Honor.

12            I would echo the thanks of defense counsel to the

13   courtroom staff and the court reporters.

14            THE COURT:  All right.  I wish everyone well, and we

15   stand adjourned.  Thank you.

16                         *    *    *

17

18

19

20

21

22

23

24

25