UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
----------------------------------------------------------x

UNITED STATES OF AMERICA,

                                         20 Cr. 160 (MKV)

       -v-

SETH FISHMAN,                               **DECLARATION**

                Defendant.
----------------------------------------------------------x

SETH FISHMAN, under penalty of perjury, hereby declares:

1.     I am a defendant in the captioned matter.

2.     I became a licensed veterinarian in 1999 and subsequently was licensed to practice in New York, Ohio, Delaware, New Jersey, Florida and Canada.  I also had the right to practice veterinary medicine in the United Arab Emirates.

**Prior Proceedings Regarding Forfeiture**

3.     It has been argued that prior to my retention of Mr. Kessler and his submission of Objections to the forfeiture pursuant to the Order of this Court, I waived my right to contest the forfeiture.  That is wrong.

4.     I never agreed to any forfeiture.  I never agreed to waive my right to contest the forfeiture and I never agreed to the legality of the government's effort to forfeit any of my assets.

5.      Further, I was never shown any documentation from the government that purported to support their calculations and, other than the few minutes I spoke with Mr. Sercarz while I was in the holding room before my sentencing, I never discussed the calculations with Mr. Sercarz or Mr. Fernich.  This may at least partially explain why Mr. Sercarz told the Court that he did not have sufficient information from me to agree to any forfeiture.

**My Veterinary Practice**

6.      Count One of the Indictment alleged that I participated in a conspiracy to distribute misbranded or adulterated substances commencing in 2002.

7.      During the period 2002 to 2007, I practiced conventional veterinary medicine, providing such services primarily for horses.  During this period, I estimate my gross income totaled between $5 million and $6 million.  Virtually none of my income during this period was derived from the sale of misbranded or adulterated substances.

8.      From 2007 to the end of 2009, I distributed some of what the government claims were adulterated or misbranded substances.  Most of that occurred at the end of this time period.  Regardless, at least 85% of my gross income during this period was derived from the practice of traditional veterinary medicine.  During this period, I estimate my gross income totaled between $3 million and $4 million.  Eighty-five percent of that gross income is between $2.55 million and $3.4 million.

**My Gross Income from Domestic Sales of Veterinary Products**

9.      The period that the government primarily focuses on is 2009-2019 ("the period in issue"). See Gov. Letter to Court re forfeiture, 11/23/22, Doc. 978, at p. 2. It is during this period that they allege that my gross income and that of my business, Equestology, from the sale of misbranded or adulterated products was more than $15 million. That is not correct.

10.      The government's calculations assume that every dime I received was from the sale of misbranded or adulterated substances. As the Court has recognized, however, this was not true. The Court mentioned medical devices such as syringes, bandages and needles. The sale of those items alone exceeded half a million dollars, as I detail below.

11.      The actual amount of my gross income from the sale of veterinary products that were neither misbranded nor adulterated during the period in issue, however, is far greater than the half a million dollars in gross income from the sales of the foregoing medical devices.

12.      During the period in issue, I received more than $10 million in gross income from the domestic sale of veterinary products that were purchased from pharmaceutical companies and other medical product wholesalers and re-sold *as is* to Equestology retail customers.

13.      In other words, these products were not opened, repackaged, relabeled, compounded or changed in any way from the form in which they were purchased. If, for

3

example, a customer ordered from Equestology five bottles of Vitamin C, 250 ml,
manufactured by Schein Pharmaceuticals, the customer *received* five bottles of Vitamin
C, 250 ml, manufactured by Schein Pharmaceuticals, unchanged in any way – the
original label and contents of the products were untouched.  Indeed, during the period in
issue, Equestology sold at least 8,486 bottles of Vitamin C, 250 ml, from Schein, to
domestic customers, resulting in gross income of at least $93,346.00.   See SFX-1701.

14.     In fact, many of these products were shipped directly from the pharmacy or
manufacturer to the customer.  In those instances, my only involvement was to pay the
pharmacy or manufacturer and bill and be paid by the customer.

**Domestic Sales of Non-Misbranded, Non-Adulterated Veterinary Products**

15.     Equestology's sales records for most of its domestic shipments were
maintained by Lisa Giannelli, primarily through the use of a bookkeeping program called
Avimark.  Ms. Giannelli recorded each sale, including the date, customer, and number of
units ordered, as well as information about the horses for whom the products were
intended, including whether the horses were standard bred or thoroughbred.

16.     I was informed that Ms. Giannelli's computer was seized by the
government at or about the time of her arrest in March 2020.  Her computer included the
Avimark data.  Fortunately, Ms. Giannelli was able to locate a backup copy of some of
the Avimark data, which she provided to my current attorneys.  From this limited data,

my attorneys have been able to calculate how many units of veterinary products were sold by Equestology to domestic clients between 2009 and 2019.  Ms. Giannelli did not maintain records of my foreign sales.

17.    The unit pricing of the veterinary products re-sold by Equestology to domestic clients was maintained separately by Ms. Giannelli in a document called a "Travel Sheet."  The government produced excerpts from the Travel Sheet during my trial and has informed this Court that it intends to rely on that document in connection with the forfeiture hearing as well.  See GX-709; Doc. 978 at p. 3.  The government apparently does not intend to submit any of the Avimark data, however.

18.    My attorneys also linked the sales data from the Avimark software with the price lists in the government's copy of the Travel Sheet to calculate the gross income generated by the sale of the veterinary products re-sold by Equestology to domestic customers during the period in issue.  The government has apparently never done this.

19.    The result of these substantial efforts is submitted as Exhibits to this Declaration.  These Exhibits, which I have reviewed, consist of sixteen charts summarizing the number of units sold and unit price of hundreds of products.  They are broken down by category, using the categories adopted by Ms. Giannelli and reflected in the Travel Sheet used by the government at trial.

20.    The sixteen categories include Vitamins, Vaccines, Fluids, Needles and Syringes, Bloodwork and Antibiotics.

21.     Accompanying the summary chart for each category are copies of the Avimark printouts that show each sale of each product to Equestology customers in that category set forth on the chart.  As the charts indicate, only products where sales totaled at least $800 during the period in issue are included.

22.     Further, it should be noted that the government's Travel Sheet, also submitted herewith, is missing at least three pages.  It jumps from numbered page 6 to an unnumbered page to numbered page 11.  There are also irregular lines at that point and others suggesting that portions of the Travel Sheet were physically cut out of the document and that the remaining pieces were then pasted together and then the cut-and-pasted document was submitted to the Court by the government.  There has been no explanation for this.  As a result, not all of the significant product sales could be located on the Travel Sheet.  As the Court can see from any of the pages, each page contains two columns of about 50 items each.  Therefore, there appear to be many hundreds of items totaling hundreds of thousands of dollars in sales that we were not able to calculate and that therefore are *not* included in our charts or in the Exhibits.

23.     Further, none of the numerous Travel Sheet codes that reflect products used in providing veterinary services, such as the use of Depo Medrol and Hyaluronic Acid 20 mg/ml in connection with intraarticular injections, are shown in the government's copy of the Travel Sheet.  I administered thousands of doses of these products during routine examinations.  Surely, then, it is no coincidence that that these items are omitted, as they

6

would directly refute the theory the government presented at my trial that I did not maintain legitimate veterinarian-patient relationships because I allegedly never conducted a direct physical examination of the horses in my care. The most extensive and detailed proof of my veterinary services is in my patient notes. However, my access to this data, maintained digitally on the 'cloud', was allowed to be permanently deleted by the government.

24.    It should be noted, however, that, for the most part, the nature of my veterinary practice did not require me to conduct a physical examination of a horse to prescribe medications which were mostly either preventive or to treat debilitating conditions common to the animals in my care. Horses are classified as livestock, not companion animals, under federal law. 29 CFR § 780.328 ("The term 'livestock' includes cattle, sheep, horses, goats, and other domestic animals ordinarily raised or used on the farm").

25.    The care I provided complied with the five requirements of the American Veterinary Medical Association for maintaining a veterinarian-client-patient relationship. See SFX-2100. Further, I employed two other veterinarians – the late Dr. Franklin Pellegrini and Dr. Elaine Gillis – who also conducted physical examinations of horses in my care when appropriate. And all of my clients had emergency referral clinics and other local veterinarians to provide such care in my absence. I worked with more than fifty veterinarians and numerous researchers globally. And one of my clients, Dr. Geoffrey Vernon, was a veterinarian for the United States Olympic Equestrian Team. He

7

purchased about $145,000 worth of products from me.  See GX-107F.

26.     Further, the omissions from the Travel Sheet of product codes evidencing hundreds of thousands of dollars in domestic sales is confirmed by my own recollection of the quantity of products sold during the period in issue.  Also, if a product was discontinued or taken off the market, it would have been removed from the Travel Sheet and therefore would likely not be included in these charts.  The bottom line is that the sales amounts reflected in our charts and Exhibits are quite conservative.  The real numbers are most certainly higher in most, if not all, categories.

27.     In addition to the sixteen charts and accompanying data printouts, my attorneys also prepared a cumulative summary chart listing only the totals of each category, followed by a 'grand total.'  SFX-100.  As the Court will see, that grand total is more than $9.7 million.  The conservative accuracy of this amount is corroborated by another printout generated by the Avimark software – a 5007-page document that lists each sale during the period in issue.  This document is labeled "Jan 1 2009-Aug.13 2019 Transaction journal" ("the Transaction Journal").  See SFX-1800.  The Transaction Journal does not include transactions that took place after August 13, 2019.

28.     As the totals on the last page provide, the Transaction Journal states that Equestology billed $11,489,667.50 for sales of veterinary products to domestic clients during the period in issue.  It further states that, of this amount, Equestology actually received payments totaling $11,398.582.70.

29.     In addition to corroborating the Avimark/Travel Sheet data charts – and confirming that those charts are conservative – the Transaction Journal also shows the expenses incurred by Equestology, *i.e.*, the amounts the company paid to pharmacies and other wholesalers to purchase these veterinary products for domestic resale.  The Transaction Journal states that Equestology paid $5,369,266.68 for the products sold as set forth in that document.

30.     Thus, the Transaction Journal demonstrates that the *gross profit* earned from the domestic resale of these veterinary products during the period in issue was $11,398,582.70 less $5,369,266.68.  That amount, $6,029,316.02, does not factor in millions of dollars in expenses, including salaries, lab fees, merchant fees, advertising, contract labor, equipment and maintenance costs.  Thus, the *net profits* during the period in issue are millions of dollars less than the $6 million gross profit sum.

31.     The calculations above relate to the products that we sold domestically. Many of the categories in the attached Exhibits demonstrate that there were millions of dollars in products sold domestically that are not "drugs" and thus do not fall within the scope of FDA regulations.  For example, as noted above, the Needles and Syringes category (SFX-1200), contains only medical devices.  *See*, *e.g.*, https://www.fda.gov/animal-veterinary/products/animal-medical-devices.  Sales of these items alone generated at least $525,365.00 in gross income during the period in issue.

32.    Similarly, I provided bloodwork services by selling to my clients medical devices such as blood tubes required for providing such services.  I also coordinated and billed for the lab services provided by companies such as Antech.  See SFX-600.  Sales of these products and services generated at least $303,863.00 during the period in issue.

33.    In addition, the dietary supplements in the Vitamins and Blood Builders category (SFX-1700) are regulated by the FDA as food, not as drugs.  *See*, *e.g.*, https://www.fda.gov/consumers/consumer-updates/dietary-supplements.  Sales of these items generated at least another $687,974.30 during the period in issue.  This amount includes sales of 50 mg 100 cc Folic Acid, a formulation of an over-the-counter product which I prepared pursuant to my licensing authority after New Era Pharmacy stopped selling it.  This formulation was specially designed for equine use.

34.    Other items in the Avimark product records which were sold over-the-counter include DCA 700, Pyroxidine, Lubrisyn and Thiamine (SFX-300), Normal Serum, Acetylcysteine, Levamisol, IGG, Gentocin 100 and 250 mls, Oxybiotic, Penicillin G, and Polyflex (SFX-400), Vitamin K, Parvolex, Red Lung 600 gr., Arnica and White Cap (SFX-500), Gastroguard Paste, Omeprazole powder and liquid, Succeed Paste, Sucralfate Liquid and Tablets (SF-1400), Azoturix, Acetyl D glucosamine and E-Se (SFX-1500) and Vaccines such as Fluvac Innovator 4-1, Pinnacle 10 Dose, Prestige 5, Vetera Gold XP and West Nile (SFX-1600).

35.     Gross income from the sale of the products sold over-the-counter listed above during the period in issue was at least $1,225,048.88.

36.     Further, numerous additional veterinary products in many of the categories set forth in the attached Exhibits are not deemed "drugs" for regulatory purposes and thus fall outside FDA jurisdiction.  Such products include Cotton Roll and Hyaluronic Acid (SFX-900), Camphor Oil and Sodium Iodide Jugs (SFX-400), Fluids such as Bacteriostatic Water, Saline Fluids, Sterile Water, and NRG, a powdered mix for electrolyte replacement drinks (SFX-800), medical devices used to administer Fluids by qualified personnel such as Infusion Pumps, IV lines and Stomach Tubes (SFX-800), products such as Ammonium Sulfate, Ammonium Chloride, Enzymes, Iodine in Almond Oil and Surgical Scrub (SFX-900), Ointments and Creams (SFX-1300), and products such as Lactanase and Magnesium Sulphate (SFX-1500).   Gross income from sales of these products exceeded $972,980.50.

37.     As reflected in the Travel Sheet, I received substantial gross income from the sale of a variety of items that are not drugs of any kind, including Stethoscopes, Bags, Gauze, Scrub Pads, Ultrasound Gel, Urine Tests, Veggiedent Chews, Breath Rite, Formalin, Clipper Blades, Gloves, Silver Nitrate, Soft Collars and Sodium Bicarbonate (baking soda).

38.    I also continued to provide and received income from traditional veterinary services during the period in issue.  A veterinary service cannot and does not constitute a misbranded or adulterated product, as it is not a product at all.

**Foreign Sales**

39.    In addition to the foregoing domestic re-sales of FDA licensed and approved products to Equestology clients, another substantial component of the amounts included by the government in Equestology's gross income during the period in issue are funds received from products purchased by governments and companies overseas.

40.    A significant component of my income from foreign sales was from governments and companies overseas, including Singapore, Qatar, Saudi Arabia, Thailand, Malaysia, Australia and Canada, as well as Brazil and other South American countries.  But most of my overseas income came from the United Arab Emirates ("UAE").  As is confirmed by the government's spreadsheet GX-107F, more than $2.03 million was received from entities in the UAE, with approximately $700,000 coming from Presidential Camel Racing ("Presidential") alone.  I was appointed the Chief Scientific Officer (SFX-1900) and the leaders of that country specifically sought out the products I sold to them.  I spent a considerable amount of time in the UAE.  The products purchased by Presidential were prepared at their request with the specific ingredients they requested.  They were custom made products and were sold to no one other than my UAE

customers. While much of the documentation confirming this was seized by the government and is not available to me, I was able to locate more than a dozen letters from the UAE government confirming this fact.  See SFX-1901.

41.     In these letters, the government of the UAE stated their desire for particular exports. These letters are examples of documents that demonstrate that the importation of the products in question comply with the laws of the UAE. The letters were written and sent by the rulers of the UAE who are empowered to make such decisions.

42.     In addition, the sales of my veterinary products shipped overseas comported with the packaging requirements for such exports.  Although much of the documentation confirming this has been seized by the government, I was able to locate a number of these "for export only" labels I caused to be placed on the exported packages. See SFX-1902. They were custom made for overseas shipments only.

43.     Much of Equestology's income from 2009-2020 was earned from the sale of products in compliance with the export exemption of Title 21 U.S.C. § 381(e) ("the export exemption"). Most of the substances I exported accorded to the specifications of the foreign purchaser, were not in conflict with the laws of the country to which they were exported, were labeled on the outside of the shipping package that they were intended for export, and were not sold or offered for sale in domestic commerce.  Such

products included so-called "drinks" for which my gross income was more than $1 million.  See SFX 1901.

44.     Products shipped to the UAE included veterinary products custom made for camels.  All of our camel products were labeled as such and were for export only.  As the Court may be aware, there is no camel racing here in the United States.

45.     Further, as with domestic sales, included in the shipments to UAE and overseas were devices such as needles, bandages, syringes, vitamins and fluids, devices that were either sold as is or were mechanical devices.

46.     As the government's own exhibits confirm, more than $2 million of the amount sought to be forfeited constituted gross income from sales to governments and companies overseas, including the United Arab Emirates, as well as from other countries such as Qatar and Singapore.  See, e.g., GX-107F, "Citi Bank Pivot."

47.      On that one chart alone, the government's own analysis confirms the following gross income from overseas sources:

| | |
|---|---|
| Wisdom Veterinary Medicines | $1,024,751.50 |
| Presidential Camel Racing AF Cent AD Mai | $  431,086.00 |
| Mano Equestrian Services LTD | $  281,680.50 |
| Presidential Camels and Camel | $  243,686.50 |
| Al Rostamani International Exchange | $  241,611.00 |
| Al Ghuwayriyah Stable LLC | $    48,725.00 |

14

| | |
|---|---|
| Presidential Camel Aff Race division | $    25,672.00 |
| Dubai Camel Hospital | $    19,550.00 |
| **TOTAL**: | **$2,316,762.50** |

48.     Further, another source of income on the government's chart, All Veterinary Supply Inc., although headquartered in Florida, actually operates as a broker for sales to Latin America.  They are a licensed exporter, with all of the required permits and authorizations to lawfully ship veterinary products directly to these countries upon receipt of freight forwarders from Equestology.  As the government's chart indicates, the gross income received from foreign sales brokered by All Veterinary Supply Inc. totaled at least $382,111.29.  That is in addition to the figures above.

50.     It is my understanding and belief that none of the nearly $3 million in income from these foreign sales is subject to forfeiture because those sales complied with U.S. export requirements.

**Panamanian Income**

51.     The government has also alleged that I am the owner of a partnership located in Panama, Equine Performance, that Equine Performance produced and sold altered and mislabeled products and that $2,283,036 was the gross income to that company, which should be attributable to me.  They are mistaken.

15

52.     Equine Performance's products were made in Australia and more than 50 percent of those products were sold outside the United States. Of the less than 50 percent sold in the United States, my share of the income was a small percentage, which is estimated to be between $200,000 and $400,000. See SFX-2000. And even that figure assumes that all of the products sold by Equine Performance were altered or misbranded. That, too, is incorrect.  Finally, my involvement with Equine Performance ended in 2014. My name remains on the papers with the bank account only because of the incompetence of the Panamanian attorney who was charged with transferring any remaining interest I had to my former partner.

**<u>Seizures</u>**

53.     In October 2019, the government executed a search warrant at my home, my office and my storage unit in Florida and seized products from Equestology.  In March 2020, they seized Equestology products from Lisa Giannelli's residence in Delaware. I estimate I had been paid more than $500,000 and as much as $1,000,000 for these seized products.

54.     In December 2021, the government seized Equestology and other products from my residence in Florida. I estimate I had been paid more than $200,000 for these products.

55.     The government has both seized these items *and* purported to "bill" me for them by adding the funds I received as payment for them to the gross income they seek to forfeit.  In short, they are double counting more than $1 million in their total.

56.     In summary, if the Court does not sustain our objection that forfeiture of any amount is not authorized by law in this case and would therefore be illegal, and if the Court wishes instead to calculate an amount of forfeiture, then, of the more than $15 million the government seeks to forfeit from me, more than $14 million is a conservative estimate of the amount that is not subject to forfeiture for the reasons detailed above.


I declare under penalties of perjury that the foregoing is true and correct, pursuant to Title 28, United States Code, § 1746.

Dated:      Miami, Florida
            February 26 , 2023

_____
Seth Fishman

17